FILED
United States Court of Appeals
Tenth Circuit

March 12, 2014

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

  Plaintiff-Counter-
  Defendant-Appellee,

v.

CONOCOPHILLIPS COMPANY,

  Defendant-Counter-
  Claimant-Appellant.

No. 12-5170

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 4:11-CV-00071-JHP-TLW)**

Andrew M. Weiner, Attorney, Tax Division (Kathryn Keneally, Assistant Attorney General; Tamara W. Ashford, Principal Deputy Assistant Attorney General; Gilbert S. Rothenberg, Attorney, Tax Division; Teresa E. McLaughlin, Attorney, Tax Division; and Danny C. Williams, United States Attorney, on the briefs), Department of Justice, Washington, D.C., for Plaintiff-Counter-Defendant, Appellee.

Stephen Gardner, Cooley LLP, New York, NY (Kathleen Pakenham, Cooley LLP, New York, NY; and Richard Noulles, GableGotwals, Tulsa, OK, on the briefs) for Defendant-Counter-Claimant, Appellant.

Before **LUCERO**, **MURPHY**, and **BACHARACH**, Circuit Judges.

**BACHARACH**, Circuit Judge.

In the 1970s and 1980s, the Internal Revenue Service was embroiled in a tax dispute with multiple companies (including Phillips Petroleum Company and Arco Transportation Alaska, Inc.[1]) that had jointly developed a pipeline system. The parties agreed to settle the dispute through a closing agreement. After entering the agreement, Phillips Petroleum Company (now ConocoPhillips Company[2]) acquired Arco Transportation. In 2000 and 2001, Conoco revisited the tax implications of its acquisition and claimed "going-forward" and "basis-increase" deductions on its amended consolidated tax returns. The IRS refunded Conoco's 2000 going-forward deductions and does not challenge them here. But the IRS disputes the remaining deductions and the parties brought the dispute to federal district court, where the district court decided the issue on cross-motions for summary judgment. The court rejected Conoco's position and granted summary judgment to the IRS.

We agree with the district court. "Going-forward" deductions are impermissible for interests that Arco Transportation did not own as of July 1, 1977, and "basis-increase" deductions are impermissible because the Closing Agreement did not fix the amount of a liability or exempt that liability from § 461(h) of the Internal Revenue Code. Thus, we hold that Conoco is not entitled to the going-forward or basis-increase deductions.

---

[1]  Arco Transportation Alaska, Inc. has changed its name multiple times. *See* Appellant's App. vol. 4, at 1630. For simplicity, we refer to this entity throughout its name changes as "Arco Transportation."

[2]  We refer to this entity (before and after the name change) as "Conoco."

2

## I.      Factual Background

This suit involves the interplay between two events:  The collective effort to develop a pipeline system and changes in the tax code.  These events led to:  (1) disagreement between the pipeline owners and the IRS, and (2) settlement of the disagreement through a closing agreement.

### A.      Development of the Pipeline System

In the late 1960s and early 1970s, a group of companies (including Conoco) joined to develop a pipeline system eventually known as "TAPS" (the Trans-Alaska Pipeline System).  To participate in this venture, each company had to assume part of the cost to dismantle the pipeline system, remove all improvements and equipment, and restore the land ("DR&R costs") when the system would eventually stop operating.  Appellant's App. vol. 1, at 238.  By 2010, these costs were expected to exceed $3 billion.  *Id.* at 240; *id.* vol. 2, at 435.

### B.      The Original Dispute

During construction of the pipeline system, TAPS's owners (including Arco Transportation) had to determine when they could start claiming deductions for the DR&R costs.  *See id.* vol. 5, at 1849.  The owners correctly assumed they would not incur any DR&R costs for several decades.  *See id.* vol. 4, at 1362.  Nonetheless, the owners started to claim DR&R deductions on their 1974 tax returns.  *Id.* vol. 5, at 1854.

3

These deductions were defensible at the time because accrual taxpayers (such as Arco Transportation) could deduct expenses in the year "in which all the events [had] occurred which determine[d] the fact of the liability and the amount thereof [could] be determined with reasonable accuracy" under the "all events" test. 26 C.F.R. § 1.461-1(a)(2) (1974); *see* Appellant's App. vol. 5, at 1858.

TAPS's owners argued that the DR&R costs satisfied this test because the fact of liability and its amount could be determined with reasonable accuracy. Appellant's App. vol. 5, at 1858. Relying on this argument, the owners claimed various deductions for the DR&R costs they expected to incur. *Id.* at 1854. The IRS disallowed these deductions. *Id.* at 1855.

The law changed in 1984 with Congress's passage of 26 U.S.C. § 461(h) (1984 supp.). Under § 461(h), accrual taxpayers could not deduct liabilities (like DR&R costs) on their tax returns before "economic performance." 26 U.S.C. § 461(h) (1984 supp.). Because § 461(h) was not retroactive, however, it did not apply to deductions claimed prior to 1984. *See United States v. General Dynamics Corp.*, 481 U.S. 239, 243 n.3 (1987). Thus, § 461(h) did not bar owners' pre-1984 DR&R deductions, but would unambiguously bar unrelated purchasers after 1984 from claiming DR&R deductions before economic performance. *See id.* at 244.

C.     **The Closing Agreement**

4

The parties settled their dispute in the 1988 Closing Agreement. Appellant's App. vol. 3, at 973-87. This agreement allows TAPS's "owners" and their "successors in interest" to take an aggregate $900 million DR&R deduction before TAPS's dismantlement "subject to" the agreement's terms. *Id.* at 974-75 ¶ 1. The agreement bound not only each listed owner, but also "any successor in interest of any owner" who "expressly assumed such owner's DR&R obligations." *Id.* at 978 ¶ 8. For owners and their successors in interest, § 461(h) would not apply to the deductions allowable under the first three paragraphs in the agreement. *Id.* at 977-78 ¶ 6. The Closing Agreement spread the aggregate deduction over the 318 months from July 1, 1977, until December 31, 2003. *Id.* at 975 ¶ 2. Each owner or successor in interest was entitled to take a monthly deduction during this period. *Id.* This monthly deduction was defined by the formula: 1/318 * $900 million * OI, "where OI is such Owner's or successor in interests' proportionate ownership interest in TAPS." *Id.*

The amount available for deduction before economic performance is capped at $900 million. *Id.* at 976 ¶ 3. If an owner or successor in interest had incurred DR&R costs before 2004, these costs would have reduced the total ($900 million) otherwise available for deduction prior to economic performance. *Id.* And, if the deductions under the Closing Agreement exceeded the DR&R costs eventually incurred, the owner or successor in interest had to treat the excess as ordinary income. *Id.*

5

The Closing Agreement also addressed what would happen if an owner or successor in interest sold its ownership in TAPS after taking a deduction. In this situation, the owner or successor in interest would ordinarily need to recapture its prior deduction. *Id.*

An exception was carved out for transfers involving related companies that file a consolidated return. *Id.* at 977 ¶ 5. Under this exception, transfers between group members who file a single consolidated tax return can create a successor in interest. *See id.* (referring to "[a]ny successor in interest acquiring an ownership interest as a result of such transfer").

### D. Changes in TAPS Ownership Interests

In 1977, Arco Transportation had a 21% ownership interest in TAPS. *Id.* at 974, 980. Three transfers then took place: (1) Arco Transportation acquired additional interests in TAPS totaling 1.295% between 1977 and 2000, (2) Conoco acquired Arco Transportation in 2000, and (3) Arco Transportation acquired an additional 3.0845% interest in 2001.

#### 1. Arco Transportation's Acquisition of an Additional 1.295% Interest in TAPS Between 1977 and 2000

Between 1977 and 2000, Arco Transportation acquired additional interests in TAPS totaling 1.295%. *Id.* vol. 5, at 1937; *id.* vol. 6, at 2483. Thus, by 2000, Arco Transportation owned a 22.295% interest in TAPS. *Id.* vol. 2, at 516-17.

#### 2. Conoco's Acquisition of Arco Transportation Stock in 2000

6

In 2000, Conoco acquired Arco Transportation by purchasing its stock and assets from BP America, Inc. *Id.* vol. 2, at 516, 563. Though the acquisition involved a stock transaction, the parties jointly elected to treat the transfer as an asset sale for federal income tax purposes. *Id.* at 517, 595; *see* 26 U.S.C. § 338(h)(10)(A) (2000).

This election resulted in the existence (for tax purposes) of "two separate corporations, old target and new target." 26 C.F.R. § 1.338-1T(a)(1) (2000). The old target was deemed to sell its assets to the new target, which acquired the assets and the liabilities. *Id.* But the new target was generally "treated as a continuation of [the] old target for purposes other than subtitle A of the Internal Revenue Code." 26 C.F.R. § 1.338-1T(b)(3) (2000).

       3.     Arco Transportation's Acquisition of an Additional 3.0845% Interest in 2001

In 2001, Arco Transportation bought an additional 3.0845% interest in TAPS from BP Pipelines (Alaska), Inc. Appellant's App. vol. 2, at 519. Arco Transportation expressly assumed BP's DR&R obligations related to this TAPS interest. *Id.* at 672-73. With this acquisition, Arco Transportation continued to own its initial 21% interest in TAPS and the additional 4.3795% interests acquired from 1977 to 2001.

## II.    Conoco's Two Types of Deductions

The appeal addresses Conoco's amended returns for 2000 and 2001. *Id.* vol. 1, at 9 ¶ 1, 13 ¶ 1, 18 ¶ 3. The government granted Conoco a tax refund based on its 2000 amended return, but contends that most of the refund was erroneous. *Id.* at 9 ¶¶ 1, 13.

Thus, the government sued to reclaim most of the money refunded to Conoco in 2001. In a counterclaim, Conoco claims that it is entitled to a tax refund based on its 2001 amended return. *Id.* at 18 ¶ 3.

The parties disagree about two types of deductions: (1) going-forward deductions for 2001, and (2) basis-increase deductions for 2000 and 2001.

Conoco's going-forward deductions are deductions under the Closing Agreement's amortization schedule for Arco Transportation's 4.3795% ownership interests in TAPS that were acquired after July 1, 1977.

The basis-increase deductions stem from the increased liabilities assumed by Conoco when it or its subsidiary (Arco Transportation) acquired additional interests in TAPS. Conoco contends that it was entitled to:

- increase "new" Arco Transportation's basis in TAPS by the amount of the "old" Arco Transportation's deductions under the Closing Agreement, and

- depreciate the adjusted basis over the 15-year recovery period for pipeline transportation property because the "new" Arco Transportation had not enjoyed the tax benefit of these guaranteed deductions.

## III.  Standard for Our Review of the Summary Judgment Ruling

In the district court, Conoco bore the burden of proving that it was entitled to the going-forward and basis-increase deductions. *See Zell v. Comm'r*, 763 F.2d 1139, 1142 (10th Cir. 1985). Concluding that Conoco had not satisfied this burden, the district court granted summary judgment to the government.

8

This determination is subject to de novo review. *Tomlinson v. El Paso Corp.*, 653 F.3d 1281, 1286 (10th Cir. 2011). In conducting this review, we will affirm if there was no genuine dispute over a material fact and the government was entitled to judgment as a matter of law. *Id.* In applying this test, we view the evidence in the light most favorable to Conoco. *See Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).

## IV. Interpretation of a Closing Agreement

Viewing the evidence in this manner, we apply "federal common law" to interpret the Closing Agreement. *United States v. Nat'l Steel Corp.*, 75 F.3d 1146, 1150 (7th Cir. 1996). Under federal law, we strictly construe a closing agreement and regard matters as settled only if they are "specifically spelled out" in the document. *Ellinger v. United States*, 470 F.3d 1325, 1337 (11th Cir. 2006); *see also Bethlehem Steel Corp. v. United States*, 270 F.3d 135, 144 (3d Cir. 2001) ("In light of the Agreement's self-consciously limited scope, its silence regarding these matters unambiguously demonstrates that they were simply not terms agreed upon by the parties.").

## V. Conoco's "Going-Forward" Deductions

Conoco's "going-forward" deductions are monthly deductions for the additional interests in TAPS that Arco Transportation acquired from 1977 to 2000 (1.295%) and the additional interest that it acquired in 2001 (3.0845%). Arco Transportation did not own these interests on July 1, 1977, when it signed the Closing Agreement. Nonetheless,

9

Conoco contends that under the Closing Agreement's amortization schedule, it was entitled to take monthly deductions for these additional ownership interests in TAPS on the 2001 consolidated tax return.

This contention is based on alternative theories that Arco Transportation is an "owner" or "successor in interest" under the Closing Agreement. We reject both theories. First, under the Closing Agreement, Arco Transportation is considered an "owner" only with respect to its TAPS interest as of July 1, 1977. Second, under the Closing Agreement, the term "successor in interest" does not include unrelated transferees (such as Arco Transportation) that purchased additional interests in TAPS after July 1, 1977.

A.   **"Owner"**

Arco Transportation is considered an "owner" only with respect to its 21% ownership in TAPS as of July 1, 1977. For the subsequently-acquired interests (totaling 4.3795%), Arco Transportation is not considered an "owner."

The deductions for "owners" are defined by the TAPS interests held on July 1, 1977. This definition is reflected in Paragraph 1, the recital clauses, and the signature pages.

The 1988 Closing Agreement stated in Paragraph 1: "The Owners . . . shall be allowed an aggregate deduction of $900,000,000 in respect of DR&R costs with respect to TAPS (*as it existed on July 1, 1977*) . . . ." Appellant's App. vol. 3, at 974-75 ¶ 1

10

(emphasis added).  The parties had no reason to add the parenthetical, "as it existed on July 1, 1977," to modify TAPS unless the parenthetical also modified the owners' interests in TAPS.

The ownership interests were tied to the date of July 1, 1977, not only in Paragraph 1, but also in the recital clauses and the signature pages.  *See Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) (contract interpretation based on recital clauses); *Sw. Stationery & Bank Supply, Inc. v. Harris Corp.*, 624 F.2d 168, 170 (10th Cir. 1980) (contract interpretation based on a signature block).  These parts of the Closing Agreement identify "owners" by their ownership interests in TAPS as they existed on July 1, 1977.

In a recital clause, the parties agreed that the adjustments would "be allocated to the Owners in accordance with the Owners' ownership interests in TAPS as of July 1, 1977."  Appellant's App. vol. 3, at 974.  The Closing Agreement then listed each owner's interest in TAPS as it existed on July 1, 1977.  *Id.*  Through these listings, the parties expressed their intent to define the term "owner" by its ownership interest as of 1977.  Parties could obtain additional TAPS interests after 1977.  But the parties would be considered "owners" only with respect to the TAPS interests they had in 1977.

The parties' intent is reflected not only in the recital clause, but also in the signature pages.  These pages indicate that two of the original owners (BP Pipelines, Inc. and Sohio Alaska Pipeline Company) merged before signing the agreement.  *Id.* at 981,

11

985. When BP Pipelines merged into Sohio Alaska Pipeline, Sohio Alaska Pipeline did not become an "owner" with respect to BP Pipeline's interest. *Id.* Instead, Sohio became a "successor in interest to the interest in TAPS held by BP Pipelines." *Id.* Therefore, the signature pages indicate that a company was considered an "owner" only with respect to its ownership interest in TAPS as of July 1, 1977. The company would not be considered an "owner" of a later-acquired interest in TAPS.

Because Arco Transportation did not own the additional 4.3795% TAPS interests on July 1, 1977, it is not an "owner" with respect to these interests. Thus, Conoco is not entitled to "going-forward" deductions for these additional interests based on the theory that Arco Transportation is an "owner."

## B. "Successor in Interest"

Conoco alternatively argues that Arco Transportation is a "successor in interest" with respect to the additional interest of 4.3795% in TAPS. We disagree. Because Arco Transportation is not considered a "successor in interest" under the Closing Agreement, its parent company (Conoco) was not entitled to the 2001 going-forward deductions.

### 1. The Parties' Definitions

The Closing Agreement does not define the term "successor in interest," and the parties offer conflicting definitions.

Conoco broadly defines "successor in interest" to mean "'[o]ne who follows another in ownership or control of property.'" Appellant's Opening Br. at 22 (quoting

12

*Black's Law Dictionary* 1570 (9th ed. 2009)).  Because Arco Transportation bought the

additional TAPS interests and acquired the DR&R obligations from another "owner,"

Arco Transportation would qualify as a "successor in interest" under this definition.

This definition is opposed by the government.  It states that an entity ordinarily

becomes a "successor in interest" through statutory succession, assuming the original

owner's rights and obligations as a matter of law.  Appellee's Br. at 54 (citing *Black's*

*Law Dictionary* 1283-84 (5th ed. 1979)).  Thus, the government contends that under the

Closing Agreement, a successor in interest ordinarily succeeds to the person who owned

the TAPS interest through a limited set of transactions, such as a merger or liquidation.

*Id.*

The government acknowledges an exception under the Closing Agreement, which

occurs when a TAPS interest is transferred between two members of an affiliated group

in a consolidated tax return year.  *Id.* at 57; *see* Appellant's App. vol. 3, at 977 ¶ 5.  But

Conoco has not shown that Arco Transportation acquired the additional TAPS interests

from a member of the same consolidated group; thus, Arco Transportation would not be

considered a "successor in interest" under the government's definition.

2.      The Text and Purpose of the Closing Agreement

For two reasons, we conclude that the government's definition is the only one that

fits the text and purpose of the Closing Agreement.

First, the Closing Agreement's text unambiguously refers to "successors in interest" as "successors" to an "owner" and provides a narrow exception for transfers between members of the same consolidated group. *See* Appellant's App. vol. 3, at 974-75 ¶ 1, 977 ¶ 5. These references support the government's definition, but not Conoco's.

Second, the Closing Agreement was designed to settle a tax dispute between the owners, their predecessors in interest, their corporate parents, and the IRS regarding DR&R deductions that each owner had claimed based on pre-1984 tax law. The government's definition of "successor in interest" reflects this purpose, and Conoco's definition does not.

### 3. The Closing Agreement's Text

The text of the Closing Agreement shows that a successor in interest: (1) succeeds the owner, assuming its identity by operation of law, or (2) results from transfer of a TAPS ownership interest between members of the same consolidated group in a consolidated return year.

The parties' disagreement turns on the meaning of the phrase "successor in interest." Conoco focuses on the word "interest" in isolation, stating that it refers to the party's ownership interest in TAPS. Appellant's Opening Br. at 31-32, 35. The government defines the term "successor in interest" differently. To the government, a "successor in interest" is a successor to an owner. Appellee's Br. at 56, 58-59. The body

14

of the agreement and the signature pages support the government's definition, but not Conoco's.

The textual issue requires us to identify what passes from an "owner" to a "successor in interest." Conoco focuses on passage of a "thing": the actual ownership interest in TAPS. The government focuses on passage of an "identity": one entity's succession to the entity that owns the TAPS interest. The difference proves decisive because Arco Transportation acquired additional interests in TAPS, but did not succeed the entities that had previously owned the TAPS interests.

The body of the Closing Agreement unambiguously discusses "successors in interest" in terms of the owners themselves and not in terms of their ownership interests in TAPS. For example, the Closing Agreement applies to "the Owners and *their* successors in interest." Appellant's App. vol. 3, at 974 ¶ 1 (emphasis added). Similarly, the amortization formula provides that "each Owner or successor in interest *to such Owner* shall be allowed a deduction for DR&R costs." *Id.* at 975 ¶ 2 (emphasis added). And Paragraph 8 refers to "any successor in interest *of any Owner.*" *Id.* at 978 ¶ 8 (emphasis added).

Conoco contends that "the word 'interest' in 'successor in interest' refers to an ownership interest in TAPS." Appellant's Opening Br. at 31. It is true that the Closing Agreement makes numerous references to an ownership interest in TAPS. But the Closing Agreement never ties the ownership interest in TAPS to the term "successor in

interest." *See* Appellant's App. vol. 3, at 973-78. Instead, the term "successor in interest" is tied to the preceding "owner."

The connection between the successor and the owner (rather than the TAPS interest) is also reflected in the signature pages. As noted previously, Sohio Alaska Pipeline Company was an owner. *Id.* at 985 (noting the name change from Sohio Pipe Line Company). But in a merger, the Sohio Alaska Pipeline Company became the successor in interest to the interest in TAPS that had been held by BP Pipelines, Inc. *Id.* at 981. Sohio signed the agreement twice: once for itself and again in its capacity as "successor in interest to BP Pipelines Inc." *Id.* at 981, 985. This signing shows that Sohio Alaska Pipeline Company became a successor in interest with respect to another owner — not that entity's ownership interest in TAPS.

Despite the contractual references linking owners and successors in interest, Conoco advances two arguments to treat a successor in interest as any transferee of an ownership interest in TAPS: (1) A transfer of part of an owner's total TAPS ownership interest creates a successor in interest; and (2) the term "successor in interest" is defined in the Closing Agreement.

Conoco's first contention assumes its own conclusion. Conoco correctly notes that portions of an owner's TAPS ownership interest can be transferred "other than by merger, liquidation, or operation of law." Appellant's Opening Br. at 29. But Conoco goes further, contending that in this scenario, "each successive transferee would be

16

treated as an Owner subject to the recapture provisions with respect to any DR&R deductions it took." *Id.* This contention relies on an unsupported assumption: that each successive transferee would be treated as an owner.

Conoco's second argument is based on a misreading of the Closing Agreement. According to Conoco, Paragraph 8 provides the only limitation on who may be a successor in interest. *Id.* at 32-33. That paragraph states that the agreement "'is binding upon, and shall inure to the benefit of, the parties' respective successors in interest, provided that any successor in interest of any Owner shall have expressly assumed such Owner's DR&R obligations, in which case each successor in interest shall be treated as an Owner.'" *Id.* (quoting Closing Agreement ¶ 8). Because this is the only requirement in the Closing Agreement for a "successor in interest," Conoco argues that the term is not qualified in any other way. *Id.* at 33.

In making this argument, Conoco misreads the paragraph. Paragraph 8 does not define the term "successor in interest." Instead, it requires a successor in interest to assume DR&R obligations to acquire any rights under the Closing Agreement.

Conoco also argues that Paragraph 8 constitutes surplusage if the term "successor in interest" is limited to successors of an owner. *Id.* This argument is incorrect. Paragraph 8 does not constitute surplusage; instead, it addresses the exception involving the filing of a consolidated tax return by related entities. The government acknowledges that a successor in interest can be created without statutory succession when members of

17

a consolidated group make an internal transfer in a consolidated return year. Appellee's Br. at 57.

To Conoco, this exception shows that the government has incorrectly defined a "successor in interest." We disagree. The exception exists because of the unique tax consequences of consolidated tax returns for members of a consolidated group of companies.

Consolidated tax returns are based on the legal fiction that the consolidated group of corporations is "for purposes of United States income tax, one taxpayer." *Int'l Tel. & Tel. Corp. v. United States*, 608 F.2d 462, 469 (Ct. Cl. 1979); *see Corp. of Am. v. Comm'r*, 4 T.C. 566, 572 (1945) ("corporations filing a consolidated return . . . constituted a single business entity and are considered as a taxable unit, and . . . the tax liability . . . in that year . . . was the tax of the group"). Thus, members of an affiliated group report their tax liability as a single consolidated group on a single consolidated tax return during a consolidated return year. *United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 826 (2001); 26 U.S.C. § 1501, *et seq.* (1988).[3] As a single taxpayer, the common parent and the subsidiaries "are severally liable for the tax for the consolidated period, including any deficiency." *Turnbull, Inc. v. Comm'r*, 373 F.2d 91, 94 (5th Cir. 1967); *see* 26 C.F.R. § 1.1502-2 (1988) ("Computation of tax liability").

---

[3]    Because we are interpreting the parties' intent in 1988, when they signed the Closing Agreement, we examine the statute in existence at the time.

18

The Closing Agreement deductions are claimed by each owner in the first instance. Appellant's App. vol. 3, at 975 ¶ 2. During a consolidated return year, this tax benefit inures to the consolidated group and reduces the group's tax liability. *See Centex Corp. v. United States*, 395 F.3d 1283, 1291 (Fed. Cir. 2005). Because this tax benefit inures to the group, it benefits each group member in a consolidated return year. But a transfer of the tax benefit between members of a consolidated group does not ultimately affect the group's tax liability.

Accordingly, Paragraph 8 does not support Conoco's definition of "successor in interest." The text of the agreement shows that the term "successor in interest" generally involves succession to the entity that owned the TAPS interest (rather than acquisition of the TAPS interest itself).

### 4. The Closing Agreement's Purpose

The government's definition of "successor in interest" fits not only the text of the Closing Agreement, but also the purpose.

This purpose was to settle a tax dispute between the owners, their corporate parents, their predecessors in interest, and the IRS regarding tax deductions the owners had taken on their consolidated tax returns. The date of TAPS ownership was all-important to this dispute. The owners contended that their DR&R liabilities were immediately deductible prior to 1984, and the IRS disagreed. Then, § 461(h) was passed. This law required economic performance before a taxpayer could deduct DR&R

19

expenses. Thus, companies acquiring a TAPS interest after 1984 could not claim any DR&R deductions before economic performance even if their predecessors could have claimed these deductions under the old law.

The statutory change in 1984 narrowed the scope of the dispute that was ultimately settled in the 1988 Closing Agreement. For the owners holding TAPS interests in 1977, an issue existed about the deductibility of DR&R costs before economic performance. But no such question existed for the companies acquiring TAPS interests after 1984. With enactment of § 461(h), these companies could readily determine that DR&R costs were not deductible until economic performance.

The government's definition of "successor in interest" is the only one that fits the scope of this tax dispute. An owner who purchased a TAPS interest after § 461(h) was passed in 1984:

- would not have been entitled to the same tax treatment with respect to that later-acquired TAPS interest, and

- could not claim deductions for that interest before payment of the DR&R costs.

26 U.S.C. § 461(h) (1984 supp.).

The adoption of § 461(h) not only narrowed the dispute, but also provided the impetus for the eventual settlement in 1988. Through that settlement, the parties intended to define "successor in interest" in terms of succession to the taxpayer (the owner) rather than acquisition of the asset (TAPS). Otherwise, signers of the Closing Agreement that

acquired TAPS interests after 1984 would obtain a windfall not enjoyed by other unrelated purchasers.[4]

5.      Summary

Under the Closing Agreement, an entity becomes a "successor in interest" in two ways: (1) by succeeding the owner through statutory succession, or (2) by acquiring a TAPS interest from an affiliated entity when the transferor and transferee file a consolidated tax return. Arco Transportation did not acquire its later-acquired interests by statutory succession or by transfer from a member of its consolidated group. Thus, Arco Transportation is not a successor in interest for the additional TAPS interests acquired from 1977 to 2001; and the parent company, Conoco, is not entitled to the tax

---

[4]      "[T]he Internal Revenue Service has promulgated definitions of 'successor in interest' for various specific purposes." *Holland v. Williams Mountain Coal Co.*, 256 F.3d 819, 822-23 (D.C. Cir. 2001). Because of the variety of regulatory purposes, the IRS has adopted different definitions of "successor in interest." For example, as noted by my esteemed colleague, the IRS defines the term "successor in interest" in determining the effect of a written determination to the taxpayer. 26 C.F.R. § 301.6110-2(l) (1988); *see* Concurrence/Dissent at 2-3 n.3. Elsewhere the IRS provides a different definition of the term "successor in interest" when addressing a corporate transaction under 26 U.S.C. § 381. Treatment of Dual Consolidated Losses, 26 C.F.R. § 1.1503-2(c)(12) (1992). Here, however, we are not interpreting the term "successor in interest" as used in a written determination by the IRS or a corporate transaction subject to 26 U.S.C. § 381. Instead, we are interpreting the term "successor in interest" in a specific context, involving an agreement to resolve a tax dispute growing out of Congress's adoption of § 461(h) in 1984 and each owner's earlier claimed tax deductions on its consolidated tax return. Thus, we are guided by the parties' purposes in entering into the Closing Agreement rather than the divergent definitions adopted by the IRS in other contexts. *See ASAT, Inc. v. Comm'r*, 108 T.C. 147 (1997) (stating that the court must interpret the term "successor in interest" in light of the purpose of the underlying code provision).

benefit of Arco Transportation's going-forward deductions on the 2001 consolidated tax return.

## VI. Conoco's "Basis-Increase" Deductions

Conoco also claims "basis-increase" deductions. But Conoco's claim to these deductions is based on a misinterpretation of the scope of the Closing Agreement.

### A. Conoco's Argument

Conoco argues that the "new" Arco Transportation, as acquired by Conoco, is entitled to deduct the full amount of the proportionate deduction that "old" Arco Transportation was entitled to take. In Conoco's view, the $900 million aggregate deduction in Paragraph 1 of the Closing Agreement is: (1) a fixed liability, and (2) exempt from 26 U.S.C. § 461(h). According to Conoco, these characteristics entitle it to take depreciation and amortization deductions based on Arco Transportation's assumption of additional DR&R costs. Appellant's Opening Br. at 36-37; *see* 26 U.S.C. §§ 167-68 (2000); *see also* Rev. Proc. 87-56, 1987-42 I.R.B. 4 (1987) (applying a 15-year recovery period to pipeline-transportation property).

We disagree with Conoco's reading of the Closing Agreement. The basis-increase deductions are permitted only if the Closing Agreement authorizes them. *See* 26 U.S.C. § 461(h) (2000). And the deductions are authorized under the Closing Agreement only if it fixed the amount of a liability and excluded that liability from § 461(h). Because the

Closing Agreement did not fix a DR&R liability or exclude it from § 461(h), Conoco cannot take the basis-increase deductions before economic performance.

## B.     The $900 Million as a Fixed Liability

Conoco's argument assumes in part that the Closing Agreement fixed a DR&R liability of $900 million. Appellant's Opening Br. at 39. This assumption is unjustified.

The DR&R liability was not fixed at $900 million, and the Closing Agreement did not say that it was. Instead, the Closing Agreement stated certain conditions that would allow a proportionate share of $900 million in deductions before economic performance. Appellant's App. vol. 3, at 974-75 ¶¶ 1-2. The agreement never equated this allowance of a deduction to a "fixed liability" under the tax code. *See id.* at 974 ¶ 1.

The $900 million simply represented the cap on deductions before economic performance. This amount was not guaranteed. For example, the owners and their successors in interest could not deduct $900 million if their eventual DR&R costs were less or if an owner transferred its interest to an unrelated entity.[5]

Conoco's basis-increase deductions are disallowed because the $900 million deduction is not a fixed liability. An allowed deduction is not the same as a "fixed

---

[5]     For example, the allowable deduction could dip below $900 million if an owner or successor in interest transferred its TAPS ownership to an unrelated entity, as BP Pipelines Alaska, Inc. did when it sold its TAPS interest to Arco Transportation in 2001. In this situation, as discussed previously, the transferee (Arco Transportation) is not considered an "owner" or "successor in interest." Thus, after disposing of a TAPS interest, the transferor would need to recapture the amortization deductions it had taken. Appellant's App. vol. 3, at 908-09 ¶ 4. In this manner, the Closing Agreement reflected that the deduction could have dipped below the $900 million cap.

liability," and the $900 million simply represents a cap on the aggregate deductions prior to economic performance.[6]

## C.     Section 461(h)

Even if the Closing Agreement had fixed a DR&R liability of $900 million, the basis-increase deductions would have been premature. Deductions based on such a fixed liability could only be taken upon economic performance. 26 U.S.C. § 461(h) (2000); 26 C.F.R. § 1.461-1(a)(2)(i) to (ii) (2000 & 2001). And Conoco had not economically performed when the deductions were claimed (in 2000 and 2001). *See* Appellant's App. vol. 4, at 1362.

Section 461(h), which bars deductions before economic performance, prevents the basis-increase deductions. 26 U.S.C. § 461(h) (2000). Indeed, Conoco does not suggest that it could adjust its basis if it were subject to § 461(h). Thus, even if the Closing Agreement had fixed a $900 million DR&R liability, Conoco could take basis-increase deductions in 2000 and 2001 only if the Closing Agreement had exempted that liability from § 461(h).

The Closing Agreement did not provide a blanket waiver of § 461(h), for it simply provided that "[s]ection 461(h) . . . [would] not be applied to limit or defer the deductions allowable pursuant to paragraphs 1 through 3 of this agreement." Appellant's App. vol.

_____

[6]     Conoco argues that an aggregate deduction of less than $900 million results in a windfall to the government. Appellant's Reply Br. at 20. This argument assumes Conoco's own reading of the Closing Agreement, which we reject. The government does not obtain a windfall if the parties had recognized in the Closing Agreement that the deductions could have totaled less than $900 million.

3, at 977-78 ¶ 6. Conoco's basis-increase deductions were not listed in Paragraph 1, 2, or 3. Because we must strictly construe the Closing Agreement, § 461(h) bars the deductions. *See Ellinger v. United States*, 470 F.3d 1325, 1337 (11th Cir. 2006).

Conoco disagrees, contending that: (1) the Closing Agreement treated the $900 million of DR&R costs as if it satisfied § 461(h), and (2) the IRS agreed not to contest deduction of $900 million based on a lack of economic performance. Appellant's Reply Br. at 18.

This argument overstates the scope of the Closing Agreement. The IRS did not remove $900 million in DR&R liability from the reach of § 461(h). Instead, the Closing Agreement provided a specific tax benefit to each owner and successor in interest. Paragraph 1 of the Closing Agreement established a deductible amount. Paragraph 2, the amortization formula, established the time and manner of that deduction. And Paragraph 3 limited the scheduled deductions based on economic performance. These deductions were self-contained and did not allow additional deductions. Thus, § 461(h) bars all deductions not listed in Paragraphs 1 through 3, including Conoco's basis-increase deductions. Appellant's App. vol. 3, at 977-78 ¶ 6.

In these circumstances, we reject Conoco's argument for the basis-increase deductions. The deductions are impermissible under § 461(h), and the Closing Agreement does not allow Conoco to avoid the statutory bar to deductions before economic performance.

25

## VII.   Conclusion

Conoco is not entitled to the asserted "going-forward" or "basis-increase" deductions.  We disallow Conoco's going-forward deductions because Arco Transportation is not an "owner" or a "successor in interest" with respect to the additional TAPS interests acquired from 1977 to 2001.  We also disallow the basis-increase deductions because the Closing Agreement's allowance of a $900 million aggregate deduction did not fix a liability or provide Conoco with a blanket exemption from § 461(h) for that amount.  Accordingly, we affirm the district court's award of summary judgment to the government.

12-5170, United States v. ConocoPhillips Co.
**LUCERO**, J., concurring in part and dissenting in part.


I agree with the reasoning of the majority opinion except to the extent that it is controlled by an unduly narrow definition of the term "successor in interest." I therefore respectfully dissent from Part V, and concur specially with respect to Part VI.

More than twenty-five years have passed since the IRS entered into a Closing Agreement with Conoco[1] and other entities that controlled the Trans Alaska Pipeline System ("TAPS"). The Closing Agreement allowed these taxpayers to take periodic deductions based on their shared obligation to dismantle the pipeline at the end of its operational life. Anticipating the possibility that interests in TAPS would be transferred, the Closing Agreement permitted "successors in interest" to take deductions similar to those permitted the original owners. An entity that transferred its interest was required to repay the government for, or "recapture," deductions beyond the dismantlement costs already incurred. The term "successor in interest," as used in the Closing Agreement, simply means a purchaser or assignee of an interest in TAPS that "expressly assume[s]" the eventual dismantlement obligations from the seller or assignor. By adopting a narrow definition of "successor in interest," my colleagues retroactively amend the Closing Agreement in a manner that deprives Conoco of the legitimate deductions to which it is entitled. This effects a windfall for the IRS.

---

[1] For convenience, party names are used in the same manner as in the Majority Opinion.

As the majority acknowledges, the Closing Agreement does not define "successor in interest." The parties advocate two divergent definitions of the term. "Successor in interest," according to the government, is limited—with one exception—to statutory succession. The reading proposed by the government requires us to interpret paragraph five of the Closing Agreement as an implied <u>and</u> exclusive exception to the putative requirement that a "successor in interest" must be a statutory successor. But paragraph five is by its plain terms nothing more than an exception to the recapture provision in paragraph four. Moreover, as Conoco points out, the only textual limitation on the term "successor in interest," found in paragraph eight, requires "successor[s] in interest" to "expressly assume[]" dismantlement obligations from the previous owner. That limitation becomes excess verbiage if the term applies only to statutory successors, which necessarily assume the obligations that the Closing Agreement requires them to "expressly assume[]."[2] <u>See</u> <u>R.J. Enstrom Corp. v. Interceptor Corp.</u>, 555 F.2d 277, 281-82 (10th Cir. 1977). Nothing in the text of the agreement supports the position taken by the government.[3]

---

[2] My colleagues suggest that the limitation was included in the Closing Agreement "to address[] the exception involving the filing of a consolidated tax return by related entities." (Majority Op. 17.) The textual basis for this conclusion eludes me. There is no such language in the paragraph containing that requirement, and the only relevant language in the agreement that discusses related entities and consolidated agreements is in paragraph five, which, as explained above, does not bear on the meaning of "successor in interest."

[3] The phrases "their successors in interest" and a "successor in interest to such Owner," do not undermine the interpretation offered by Conoco. Rather, their presence

2

Conoco argues that "successor in interest" must include any entity that assumed an interest in TAPS originally owned by one of the signatories to the Closing Agreement. That position is in harmony with the text of the Closing Agreement. It accords with the only textual limitation on the term "successor in interest" that appears in the Agreement. Even the exception in paragraph five, upon which the government relies, better corresponds to the interpretation proffered by Conoco. The language of paragraph five does not create a broad exception to the term "successor in interest;" it establishes a narrow exception to the recapture provision for a subset of successors. As my colleagues note, this exception to the recapture provision makes sense for tax purposes unrelated to the definition of "successor in interest." (See Majority Op. 17-18.) There is no reason, nor need, to manipulate the paragraph such that it creates an exception to the term "successor in interest."

I would hold that Arco Transportation is a "successor in interest" with respect to the 4.3795% interest in TAPS it acquired between 1977 and 2001, and that Conoco is entitled to take the going-forward deductions as defined by the Closing Agreement. To

supports the position articulated by Conoco because the phrases comport with IRS regulations propounding, in a similar context, precisely such an interpretation of "successor in interest." See 26 C.F.R. § 301.6110-2 (1977) ("A 'successor in interest' to any person to whom a written determination pertains or background file document relates is any person who acquires the rights and assumes the liabilities of such person with respect to the transaction which was the subject matter of the written determination, provided that the successor in interest notifies the Commissioner with respect to the succession in interest." (emphases added)). Although I agree with my colleagues that the regulatory definition of "successor in interest" is persuasive rather than binding in this context, I note that the regulation with an alternative definition cited by the majority was promulgated several years after the execution of the Closing Agreement.

the extent that the majority denies those deductions, Conoco is deprived of its bargain

and the IRS receives a windfall to which it is not entitled.