**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 12, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENT CIRCUIT

---

MART D. GREEN, Trustee of the
David and Barbara Green 1993
Dynasty Trust,

Plaintiff - Appellee,

v.

No. 16-6371

UNITED STATES OF AMERICA,

Defendant - Appellant.

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:13-CV-01237-D)**

---

Geoffrey J. Klimas, Attorney, Tax Division (David A. Hubbert, Acting Assistant
Attorney General and Teresa E. McLaughlin, Attorney, Tax Division, with him on
the briefs), Department of Justice, Washington, DC, appearing for Appellant.

Charles E. Geister, III (J. Leslie LaReau, Len Cason, and Michael A. Furlong,
with him on the brief), Hartzog Conger Cason & Neville, LLP, Oklahoma City,
Oklahoma, appearing for Appellee.

---

Before **BRISCOE**, **EBEL**, and **MATHESON**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Plaintiff Mart Green, as Trustee of the David and Barbara Green 1993 Dynasty Trust (the Trust), filed this action seeking a refund of federal income taxes paid by the Trust for the taxable year ending December 31, 2004. At issue is the amount of the charitable deduction that the Trust may take pursuant to 26 U.S.C. § 642(c)(1) in connection with its donation of three parcels of real property. The district court granted partial summary judgment in favor of the Trust, concluding that the Trust was statutorily authorized to a deduction equivalent to the fair market value of the properties as of the time of donation. The parties reached an agreement regarding the fair market value of two of the properties, and the district court held a jury trial to determine the fair market value of the third property. The district court then entered judgment in favor of the Trust. The government now appeals. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reject the district court's interpretation of § 642(c)(1) and conclude that the amount of the deduction thereunder is limited to the Trust's adjusted basis in the donated properties. Consequently, we reverse the judgment of the district court and remand with directions to enter summary judgment in favor of the government.

I

*Factual background*

*a) The Trust and its relevant provisions*

In December 1993, David M. Green and Barbara A. Green (the Greens)

2

executed an instrument creating the Trust. App., Vol. 1 at 14. The Trust instrument named Mart Green as the initial trustee (the Trustee). Article II, Section 2.1 of the Trust instrument, entitled "General Guide for Trustee," outlined the Greens' expressions of intent for the Trust:

> We want to provide for the relative health, education and maintenance needs of our children and descendants during the term of this Trust, and to provide for charity. In the absence of competing considerations, the Trustee should make an effort to primarily provide for the health and maintenance needs of our children. However, we recognize that different needs may and probably will arise as between our children and their descendants, particularly as to educational expenses and perhaps also with respect to their health and medical needs.

Id. at 20.

Article I, Section 1.6 of the Trust instrument, entitled "Distributions to Charities," stated as follows:

> A distribution may be made from the Trust to charity only when both the purpose of the distribution and the charity are as described in Section 170(c) of the [Internal Revenue] Code. Notwithstanding anything else contained in the Trust to the contrary, the number of charities that would be eligible to receive a distribution under this Trust at any given time will be limited to a number that will not prevent the Trust from qualifying either as an Electing Small Business Trust ("ESBT") or otherwise as an S corporation shareholder under the Code.

Id. at 19. Section 1.6 did not specify whether distributions to charity were limited to the Trust's principal, or instead could come from its income.

Exhibit A to the Trust was entitled "STANDARD TRUST PROVISIONS."

Id. at 31. Article IV, Section 4.5 thereof, entitled "Trustee's Power to Determine

3

Income and Principal," stated, in pertinent part: "The Trustee shall have full power and authority to determine the manner in which expenses are to be treated and in which receipts are to be credited as between income and principal and to determine what shall constitute income or principal." Id. at 52.

### b) GDT CG1 LLC

GDT CG1 LLC (GDT) is a single-member limited liability company that is wholly owned by the Trust. As such, GDT is disregarded for federal income tax purposes. In other words, all of GDT's income, deductions and credits are passed through to and reported by the Trust.

### c) The Trust's interest in and income from the Hob-Lob Limited Partnership

Hob-Lob Limited Partnership (Hob-Lob) owns and operates most of the "Hobby Lobby" retail stores that are located nationwide. Between 2002 and 2004, the Trust held a 99 percent ownership interest in Hob-Lob; in other words, the Trust was the 99 percent limited partner in Hob-Lob.

During the year ending December 31, 2002, the Trust's distributive share of Hob-Lob's ordinary business income totaled $72,465,646 and, during that same year, the Trust received distributions of $38,722,126 from Hob-Lob.

During the year ending December 31, 2003, the Trust's distributive share of Hob-Lob's ordinary business income totaled $68,303,318 and, during that same year, the Trust received distributions of $41,076,436 from Hob-Lob.

4

During the year ending December 31, 2004, the Trust's distributive share of Hob-Lob's ordinary business income totaled $60,543,215, and the Trust received distributions of $29,480,397 from Hob-Lob.

*d) The Virginia property*

On February 19, 2003, GDT purchased 109 acres of land and two industrial buildings in Lynchburg, Virginia for approximately $10.3 million dollars. GDT obtained the money to purchase the property through a distribution from Hob-Lob to the Trust in 2003. This distribution was part of the distributive share of ordinary business income from Hob-Lob to the Trust in 2003.

On March 19, 2004, GDT donated to the National Christian Foundation Real Property, Inc. (NCF) approximately 73 of the 109 acres of land and the two industrial buildings. As of the date of the donation, NCF was an organization of the type described in 26 U.S.C. § 170(b)(1)(A) (Internal Revenue Code § 170(b)(1)(A)).

The Trust reported on a Form 8283, Noncash Charitable Contributions, attached to its 2004 income tax return that its adjusted basis in the Virginia property was $10,368,113 as of March 19, 2004, the date of the donation. The Virginia property had a fair market value in excess of $10,368,113 on the date of the donation.

*e) The Oklahoma property*

In August 2002, GDT purchased a church building and several outbuildings in Ardmore, Oklahoma from Trinity Baptist Church for $150,000. GDT obtained the $150,000 to purchase the property through a distribution from Hob-Lob to the Trust in 2002. This distribution was part of the distributive share of ordinary business income from Hob-Lob to the Trust in 2002.

On October 5, 2004, GDT donated the Ardmore property to the Southwest Oklahoma District Church of the Nazarene (SODCN). As of the date of the donation, SODCN was an organization described in Internal Revenue Code § 170(b)(1)(A).

The Trust reported on a Form 8283, Noncash Charitable Contributions, attached to its 2004 income tax return that its adjusted basis in the Oklahoma property was $160,477 on October 5, 2004, the date of the donation. It is undisputed that the Oklahoma property had a fair market value of $355,000 on the date of the donation.

*f) The Texas property*

In June 2003, GDT purchased approximately 3.8 acres of land in Dickinson, Texas from Marina Bay Development Corp., Inc./Travis Moss for $145,000. GDT obtained the $145,000 to purchase the property through a distribution from Hob-Lob to the Trust in 2003. This distribution was part of the distributive share of ordinary business income from Hob-Lob to the Trust in 2003.

6

On October 5, 2004, GDT donated the Texas property to the Lighthouse Baptist Church. As of the date of the donation, the Lighthouse Baptist Church was an organization described in Internal Revenue Code § 170(b)(1)(A).

The Trust reported on a Form 8283, Noncash Charitable Contributions, attached to its 2004 income tax return that its adjusted basis in the Texas property was $145,180 on October 5, 2004, the date of the donation. It is undisputed that the Texas property had a fair market value of $150,000 on the date of the donation.

g) *The Trust's 2004 tax return*

In October 2005, the Trust filed its income tax return for 2004. The return reported income of approximately $58.8 million, of which $58,712,171 was unrelated business income. The return claimed a charitable deduction totaling $20,526,383. This included the donations of real property, as well as a $1,851,502.42 cash donation to the Reach the Children Foundation, Inc. The return reported that the Trust's total adjusted basis in the three donated real properties was approximately $10.7 million and that the properties' fair market value at the time of donation was approximately $30.3 million. At no point in 2004 or any other tax year did the Trust report as income the properties' unrealized appreciation of approximately $19.6 million (i.e., the claimed fair market value minus the adjusted basis).

7

*h) The amended 2004 tax return*

On October 15, 2008, the Trust filed an amended Form 1041 income tax return claiming a refund from the Internal Revenue Service (IRS) for $3,194,748 in income tax and increasing the Trust's reported charitable deduction from $20,526,383, as reported on the Trust's original 2004 income tax return, to $29,654,233.

*i) The IRS's disallowance of the refund*

On December 8, 2011, the IRS sent the Trustee a Notice of Disallowance of the Trust's refund claim. That Notice stated, in pertinent part: "The charitable contribution deduction for the real property donated in 2004 is limited to the basis of the real property contributed." Aplt. App., Vol. I at 162.

*Procedural background*

On November 21, 2013, the Trustee initiated this action by filing a complaint in the Western District of Oklahoma against the United States seeking recovery of federal income tax for the taxable year ending December 31, 2004. The complaint alleged, in pertinent part, that "the Trust made charitable contributions during 2004 of real properties to qualified organizations operated exclusively for religious purposes" and that "[t]he fair market value of these real properties at the respective dates of contribution totaled $30,313,000." App., Vol. 1 at 12. The complaint in turn alleged that "the Commissioner erroneously" concluded "that the charitable deduction for the real property donated in 2004 was

8

limited to the basis of the real property contributed, in addition to the applicable [Unrelated Business Taxable Income (UBTI)] limitation." Id. at 13. The complaint alleged that, due to the Commissioner's error, the Trust "ha[d] overpaid [its 2004] income tax . . . by $3,194,748, and [wa]s entitled to a refund of such overpayment plus interest as provided by law." Id.

In early 2015, the parties filed cross motions for summary judgment. The Trust's motion asked the district court to rule as a matter of law that the deduction allowed by § 642(c)(1) should be based on the fair market value of the donated property. The government's motion, in contrast, argued that the deduction allowed by § 642(c)(1) is limited to the adjusted basis of the donated property.

The district court subsequently granted the Trust's motion for partial summary judgment and denied the government's motion for summary judgment. Following the district court's rulings, the parties reached an agreement regarding the fair market values of the donated Oklahoma and Texas properties. That left one remaining issue of fact: the fair market value of the Virginia property at the time of its donation. That issue was tried to a jury in October 2016.

On November 4, 2016, the district court entered judgment in accordance with its summary judgment ruling, the stipulations of the parties, and the jury's verdict. The judgment awarded the Trust $2,754,514, plus interest, in overpaid taxes.

9

On December 28, 2016, the government filed a timely notice of appeal.

II

In this appeal, the government challenges the district court's grant of summary judgment in favor of the Trust, arguing that the district court's holding is contrary to the language of § 642(c)(1) and effectively "allows a duplicative tax benefit, in the form of a deduction for an amount that was never taxed." Aplt. Br. at 20. As outlined in greater detail below, we agree with the government.

*Standard of review*

We review the district court's grant of summary judgment de novo. United States v. ConocoPhillips Co., 744 F.3d 1199, 1204 (10th Cir. 2014). "In conducting this review, we will affirm if there was no genuine dispute over a material fact and" the Trust "was entitled to judgment as a matter of law." Id. Further, "[i]n applying this test, we view the evidence in the light most favorable to" the government, the non-moving party. Id.

*Section 642(c)(1) of the Internal Revenue Code*

Generally speaking, the Internal Revenue Code (the Code) treats charitable contributions made by trusts differently than charitable contributions made by

individuals and corporations.[1]  In particular, § 642(c)(1) of the Code, entitled

"Deduction[s] for amounts paid or permanently set aside for a charitable

purpose," sets forth the following special charitable deduction rules for trusts:

> **(1) General rule.**--In the case of an estate or trust (other then [sic] a trust meeting the specifications of subpart B), there shall be allowed as a deduction in computing its taxable income (in lieu of the deduction allowed by section 170(a), relating to deduction for charitable, etc., contributions and gifts) any amount of the gross income, without limitation, which pursuant to the terms of the governing instrument is, during the taxable year, paid for a purpose specified in section 170(c) (determined without regard to section 170(c)(2)(A)).  If a charitable contribution is paid after the close of such taxable year and on or before the last day of the year following the close of such taxable year, then the trustee or administrator may elect to treat such contribution as paid during such taxable year.  The election shall be made at such time and in such manner as the Secretary prescribes by regulations.

26 U.S.C. § 642(c)(1).[2]

---

[1] Section 170 of the Code governs charitable deductions made by individuals and corporations and limits the total amount of charitable deductions to 20, 30, or 50% of the individual's or corporation's contribution base (i.e., their adjusted gross income, subject to certain adjustments).

[2] Section 681, entitled "Limitation on charitable deduction," is a second and related Code provision that governs charitable deductions made by trusts. 26 U.S.C. § 681.  Subsection (a) thereof, entitled "Trade or business income," provides as follows:

> In computing the deduction allowable under section 642(c) to a trust, no amount otherwise allowable under section 642(c) as a deduction shall be allowed as a deduction with respect to income of the taxable year which is allocable to its unrelated business income for such year.  For purposes of the preceding sentence, the term "unrelated business income" means an amount equal to the amount which, if such trust were exempt from tax under section 501(a) by reason of section 501(c)(3), would be computed as its unrelated business

(continued...)

11

The parties to this appeal generally agree that § 642(c)(1) governs the Trust's donations of real properties during the taxable year 2004. They disagree, however, on the allowable amount of the deduction stemming from those donations.

*The requirements imposed by § 642(c)(1)*

In resolving this question, "[w]e begin 'where all such inquiries must begin: with the language of the statute itself.'" Caraco Pharm. Lab., Ltd. v. Novo Nordisk A/S, 566 U.S. 399, 412 (2012) (quoting United States v. Ron Pair Enter., Inc., 489 U.S. 235, 241 (1989)). As an initial matter, it is apparent that § 642(c)(1) applies only to estates and trusts ("In the case of an estate or trust"). Section 642(c)(1) proceeds to state that estates and trusts are entitled to ("shall be allowed") a "deduction in computing [their] taxable income." The parameters of that deduction are then outlined as follows: "any amount of the gross income, without limitation, which pursuant to the terms of the governing instrument is, during the taxable year, paid for a purpose specified in section 170(c) (determined without regard to section 170(c)(2)(A))." Focusing on the latter portions of this statutory language, it is clear that the donation must be authorized by the

---

[2](...continued)
taxable income under section 512 (relating to income derived from certain business activities and from certain property acquired with borrowed funds).
26 U.S.C. § 681(a).

12

instrument establishing the estate or trust, be made during the taxable year at issue or, alternatively, during the calendar year following the taxable year at issue, and qualify as a "charitable contribution" under § 170(c) of the Code.

Thus, to restate, it is clear and indisputable that § 642(c)(1) imposes the following requirements for a donation to qualify as a charitable deduction:

> 1) the taxpayer is an estate or trust;
>
> 2) during the taxable year at issue, or, alternatively, within the calendar year following the taxable year at issue, the taxpayer makes a qualifying charitable contribution under I.R.C. § 170(c); and
>
> 3) the charitable contribution must be authorized by the terms of the instrument that established the taxpayer, i.e., the estate or trust.

That, of course, leaves the central question at issue in this appeal: what is the authorized amount of a deduction under § 642(c)(1)? The answer to that question presumably lies in the statutory phrase "any amount of the gross income." One possible interpretation of the statutory phrase "any amount of the gross income" is that a charitable contribution must be made out of gross income earned by the trust in the taxable year in question. Indeed, the IRS urged that very interpretation before the Supreme Court in Old Colony Trust Co. v. Comm'r, 301 U.S. 379 (1937), a case involving § 642(c)(1)'s predecessor statute. Notably, however, the Court rejected that interpretation. 301 U.S. at 384. In particular, the Court stated: "There are no words limiting [deductible contributions] to

13

something actually paid from the year's income." Id. The Court proceeded no further in interpreting the statutory language, however, because the charitable contributions at issue before it were made out of an accumulated gross income account. Thus, the Court left unresolved the precise meaning of the phrase "any amount of the gross income."

A second possible meaning, and one consistent with the holding in Old Colony but not urged by either party in this case, is that a charitable contribution must be made exclusively out of gross income earned by the trust at some point in time, so long as that gross income is, from the time it is earned until it is donated, kept separate from the trust's principal. See Old Colony, 301 U.S. at 384 ("Congress sought to encourage donations out of gross income . . . ."); see also W. K. Frank Trust of 1931 v. Comm'r, 145 F.2d 411, 413 (3d Cir. 1944) (interpreting predecessor statute to § 642(c)(1) as limiting deductible contributions to those made from gross income). This interpretation, which is the most restrictive one possible given the statutory language, would effectively preclude the Trust in this case from being able to deduct any of the donations of real property because none of those properties constituted gross income to the Trust.

A third possible meaning, and the one that both parties in this case appear to be urging, is that a charitable contribution need not be made directly from, but instead must simply be traceable to, current or accumulated gross income. As

14

applied to contributions of real property, that would mean that the real property must have been purchased with, i.e., sourced from, the trust's current or accumulated gross income.  At least one treatise on federal taxation supports this interpretation of § 642(c)(1).  See 9 MERTENS LAW OF FEDERAL INCOME TAXATION §§ 36:72, 36:75 (Eric D. Spoth ed., Dec. 2017).

The fourth and final possible meaning, and one that neither party in this case has urged, is that the amount of the charitable deduction is capped or limited by the amount of the gross income earned by the taxpayer in the tax year in question.  Arguably, the following language in Old Colony supports this interpretation: "Section 162(a) [the predecessor to § 642(c)(1)] permits them [i.e., deductible contributions] to the full extent of gross income."  301 U.S. at 384. Further, at least one tax treatise argues in favor of this interpretation.  See Byrle M. Abbin, INCOME TAXATION OF FIDUCIARIES AND BENEFICIARIES, § 4128.3 (2006).  But one federal district court has expressly rejected this proposed interpretation as inconsistent with the general scheme outlined in Subchapter J of Chapter 1 of the IRC for the taxing of trusts and estates.  See Crestar Bank v. I.R.S., 47 F. Supp. 2d 670, 675–76 (E.D. Va. 1999).

All of which leads us to conclude that the statutory phrase "any amount of the gross income," as employed in § 642(c)(1), is ambiguous.  See Chickasaw Nation v. United States, 534 U.S. 84, 90 (2001) (noting that a statute is ambiguous if it is capable of being understood in two or more possible ways); see

15

Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc., 764 F.3d 1199, 1226 (10th Cir. 2004) ("A statute is ambiguous if it is reasonably susceptible to more than one interpretation") (internal quotations omitted).

*The IRS's regulation interpreting § 642(c)(1)*

In resolving this ambiguity, we note that the IRS has implemented a regulation purporting to interpret § 642(c)(1). That regulation, 26 C.F.R. § 1.642(c)-1, states, in pertinent part:

> **(a) In general. (1)** Any part of the gross income of an estate, or trust which, pursuant to the terms of the governing instrument is paid (or treated under paragraph (b) of this section as paid) during the taxable year for a purpose specified in section 170(c) shall be allowed as a deduction to such estate or trust in lieu of the limited charitable contributions deduction authorized by section 170(a). In applying this paragraph without reference to paragraph (b) of this section, a deduction shall be allowed for an amount paid during the taxable year in respect of gross income received in a previous taxable year, but only if no deduction was allowed for any previous taxable year to the estate or trust, or in the case of a section 645 election, to a related estate, as defined under § 1.645–1(b), for the amount so paid.

26 C.F.R. § 1.642(c)-1(a)(1).

It is well established, under Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837 (1984), that we must defer to an agency's regulation that reasonably interprets an ambiguous statute. See Keller Tank Servs. II, Inc. v. Comm'r, 854 F.3d 1178, 1195 (10th Cir. 2017). As the Supreme Court noted in Chevron, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." 467 U.S. at 844.

16

"This deference applies to Treasury regulations." Keller, 854 F.3d at 1195. "For

a construction to be permissible, we need not conclude it was the only one the

agency could reasonably have adopted or that we would have rendered the same

interpretation if the question arose initially in a judicial context." Id. at 1196.

Instead, "we look only to whether the implementing agency's construction is

reasonable." Id.

In our view, the IRS's regulatory construction of § 642(c)(1) is reasonable

and thus permissible.[3] That construction effectively construes the statutory

phrase "any amount of the gross income" to mean that charitable donations must

be made out of a trust's gross income. In other words, the IRS's regulatory

construction is consistent with the second and third interpretations that we

outlined above. Unfortunately, however, it does not otherwise appear to

distinguish between those two interpretations. More specifically, nothing in the

regulation discusses whether real property purchased with gross income can be

treated as the equivalent of gross income for purposes of the deduction outlined in

§ 642(c)(1). So, in the end, the IRS's regulation narrows the possible

---

[3] We recognize that some Justices have questioned the constitutionality of Chevron deference. E.g., Michigan v. Envtl. Prot. Agency, 135 S. Ct. 2699, 2712 (2015) (Thomas, J., concurring) ("Either way, Chevron deference raises serious separation-of-powers questions."). Even if that ultimately proves to be correct, it is of no consequence in this case because we would still arrive at the same conclusion because we believe that the IRS's position, as outlined in the regulation, is the most reasonable interpretation of the statute.

17

constructions of the statute, but does not completely resolve them.

*The IRS's interpretation of § 642(c)(1)*

Although 26 C.F.R. § 1.642(c)-1 does not address the precise question before us, the IRS articulated an official position regarding the construction of § 642(c)(1) when it administratively rejected the Trust's request for a refund, and it continues to stand by that construction in this litigation. We need not decide whether the IRS's construction is entitled to any deference under Chevron because, even assuming it is not, we would adopt the same construction because we conclude it is the most reasonable one in light of the Code as a whole.

As an initial matter, the IRS asserts, and the Trust agrees, that the statutory phrase "any amount of the gross income" means that charitable donations must be made out of a trust's gross income, but that real property purchased with gross income can also be treated as the equivalent of gross income for purposes of the deduction outlined in § 642(c)(1). This, we conclude, is an entirely reasonable interpretation of the statutory language. More specifically, this interpretation is consistent with the statutory language, and also encourages charitable donations to a greater degree than an interpretation that fails to include a sourcing component, i.e., an interpretation that limits the deduction to donations made

18

exclusively from gross income.[4]  See Old Colony, 301 U.S. at 384 ("Congress

sought to encourage donations out of gross income . . . .").

That still leaves open the question of the allowable amount of a deduction

for donated real property that was purchased with a taxpayer's gross income.  The

IRS has consistently asserted, both in addressing the Trust's claim for a refund

and in this litigation, that the deduction amount is limited to the taxpayer's

adjusted basis in the donated real property, i.e., the amount of gross income the

taxpayer originally paid for the real property.  Without granting any deference to

the IRS's position, we conclude that it is the most reasonable interpretation of the

statutory language, particularly when considered in light of the Code as a whole.

It is well established that tax deductions are generally considered a matter

of "legislative grace" and "only as there is clear provision therefor can any

particular deduction be allowed."  New Colonial Ice Co. v. Helvering, 292 U.S.

435, 440 (1934); see Green Solution Retail, Inc. v. United States, 855 F.3d 1111,

1121 (10th Cir. 2017) (noting that deductions are not a matter of right, but rather

a matter of legislative grace, and also rejecting the notion that the disallowance of

a deduction constitutes a penalty).  Consequently, it is the taxpayer's burden to

---

[4] In reaching this conclusion, we note that the Government has not cited to any section of the Code, any regulation, or even any treatise or basic accounting principle that directly supports its proposed interpretation.

19

establish its entitlement to the claimed deduction.[5]  Knight v. Comm'r, 552 U.S.

181, 192 (2008).  That said, the Supreme Court has stated that tax provisions

allowing for charitable deductions are an expression of "public policy" rather than

legislative grace, and consequently should be liberally construed in favor of the

taxpayer.  Helvering v. Bliss, 293 U.S. 144, 150–51 (1934).

As we have concluded, it is consistent with this latter principle—of

construing charitable deductions liberally in favor of taxpayers—to construe the

term "gross income," as used in § 642(c)(1), to extend to properties purchased

with gross income.  The Trust argues, and the district court agreed, that this same

principle of liberal construction should authorize the deduction to the full extent

of the fair market value of the donated property.[6]  We agree with the IRS,

however, that the better argument is that, construing § 642(c)(1) in light of other

provisions of the Code, the amount of the deduction must be limited to the

adjusted basis of the property.

The term "gross income" is generally defined in the Code to mean "all

income from whatever source derived," 26 U.S.C. § 61(a), and it specifically

includes "[g]ains derived from dealings in property."  26 U.S.C. § 61(a)(3).  "The

Code does not define the term 'dealing' and it does not expressly state that gains

---

[5] The Trust's counsel conceded at oral argument that the burden in this case lies on the Trust to establish its entitlement to its claimed deduction.

[6] Never has the Supreme Court said that this canon of liberal construction regarding charitable deductions means that a taxpayer must win in every case.

and losses are disregarded until an act constituting 'dealing' in property takes place." San Antonio Sav. Ass'n v. C.I.R., 887 F.2d 577, 581 (5th Cir. 1989). But an applicable Treasury regulation reasonably, albeit implicitly, construes the term "dealing" to mean that such gains occur only upon "the sale or exchange" of the property at issue:

> Gain realized on the sale or exchange of property is included in gross income, unless excluded by law. For this purpose property includes tangible items, such as a building, and intangible items, such as goodwill. Generally, the gain is the excess of the amount realized over the unrecovered cost or other basis for the property sold or exchanged. The specific rules for computing the amount of gain or loss are contained in section 1001 and the regulations thereunder. When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts, and the gain realized or loss sustained on the part of the entire property sold is the difference between the selling price and the cost or other basis allocated to such part. The sale of each part is treated as a separate transaction and gain or loss shall be computed separately on each part. Thus, gain or loss shall be determined at the time of sale of each part and not deferred until the entire property has been disposed of.

26 C.F.R. § 1.61-6(a). Further, case law provides that an "exchange" occurs when a taxpayer gives an asset to another entity and, in return, receives a materially different asset from the other entity. E.g., San Antonio Sav. Ass'n, 887 F.2d at 583 (recognizing "the principle that the receipt of something materially different . . . from that which the taxpayer had previously is necessary for an exchange to be considered a realization event").

Defining the term "dealing" to include only sales or exchanges is consistent with the concept of realization.  The Supreme Court has held that a gain "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it."  Rutkin v. United States, 343 U.S. 130, 137 (1952).  Section 1001(a) of the Code incorporates this concept, noting that "[t]he gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain."  26 U.S.C. § 1001(a).  Further, § 1001(b) states that "[t]he amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received."  26 U.S.C. § 1001(b).

As the IRS correctly notes in this case, because the Trust never sold or exchanged the properties at issue, it never realized the gains associated with their increases in market value and was therefore never subject to being taxed on those gains.  Thus, construing § 642(c)(1)'s deduction to extend to unrealized gains would be inconsistent with the Code's general treatment of gross income.[7]

---

[7] The Code, as the government correctly notes, excludes from gross income the appreciation in the value of real property, unless and until the taxpayer realizes the gain by selling or exchanging the property.  Aplt. Br. at 28 (citing Cottage Savings Assoc. v. Comm'r, 499 U.S. 554, 559 (1991)).  This "realization requirement," the Supreme Court has held, "is implicit in § 1001(a) of the Code . . . which defines the gain or loss from the sale or other disposition of property as the difference between the amount realized from the sale or disposition of the

(continued...)

22

Consequently, unless and until Congress acts to make clear that it intended for the § 642(c)(1) deduction to extend to unrealized gains associated with real property originally purchased with gross income (similar to what Congress did in § 170, which, as we have noted, addresses charitable contributions by individuals and corporations), we conclude that we cannot construe the deduction in that manner.[8]

Finally, we note that this interpretation finds support in a leading tax treatise, see 9 MERTENS LAW OF FEDERAL INCOME TAXATION, § 36:75 (Eric D. Roth ed., Dec. 2017) ("Where appreciated property purchased from accumulated gross income is donated, the amount of the deduction is limited to the adjusted basis of the property, rather than based on the fair market value of the donated property."), as well as, at least in part, an older Third Circuit case dealing with § 642(c)(1)'s predecessor statute. See W. K. Frank Trust of 1931 v. Comm'r, 145 F.2d 411, 413 (3d Cir. 1944) (holding that the appreciated value of shares of

----

[7](...continued)
property and its adjusted basis." Cottage Savings, 499 U.S. at 559. Consequently, it is clear, and the Trust concedes, "that giving away appreciated property does not result in gross income to the donor." Aplt. Br. at 29; see App., Vol. II at 288 ("No one disputes that unrealized appreciation is not part of a taxpayer's 'gross income.'").

[8] The government also cites, persuasively in our view, to other Code provisions that employ the phrase "amount of the gross income," all of which have been interpreted to mean the amount of gross income earned and reported by the taxpayer. See Aplt. Br. at 41–42.

23

donated stock, which was the result of them being "worth more on the market when the gift was made than . . . when the trust got them," "was not gross income").[9]

*The district court's reasoning*

We find unpersuasive the other bases cited by the district court for adopting the Trust's fair market value arguments. First, in concluding that the Trust was entitled to deduct the fair market value of the properties as of the time they were donated, the district court relied, in part, on § 642(c)(1)'s use of the phrase "without limitation." That, however, was a misconstruction of the statute. In United States v. Benedict, 338 U.S. 692, 697 n.8 (1950), the Supreme Court held that the phrase "without limitation," as used in the predecessor statute to § 642(c)(1), was intended only to make clear that the percentage limits outlined in § 170 that apply to charitable deductions made by individuals and corporations do not apply to charitable deductions made by estates and trusts. Presumably, the same holds true for § 642(c)(1). Thus, contrary to the conclusion reached by the district court, § 642(c)(1)'s use of the phrase "without limitation" cannot be construed as a signal by Congress to authorize the extent of the deduction sought by the Trust in this case.

---

[9] To be clear, W. K. Frank differs from the instant case because the donated stock at issue in that case was not purchased with the Trust's gross income.

The district court also relied on the Supreme Court's decision in Old Colony for the proposition that charitable giving should be encouraged and, thus, that § 642(c)(1) should be construed in such a manner. To be sure, the Court in Old Colony stated that the "language [of § 642(c)(1)'s predecessor] should be construed with the view of carrying out the purpose of Congress—evidently the encouragement of donations by trust estates." 301 U.S. at 384. But it made this statement solely in the context of deciding whether the authorized deduction should be limited to amounts "paid from the year's [gross] income." Id. The statement cannot be taken as a command to construe the deduction in the broadest possible manner, particularly when there is no language in § 642(c)(1) to support it and when the Code in general weighs against it.

Lastly, the district court concluded, in part, that because § 170 in certain instances allows individuals to claim a deduction for the fair market value of donated property, it is proper to interpret § 642(c)(1) in a similar fashion. As the government correctly notes, however, the language of § 170 expressly discusses the fair market value of donated real property, whereas § 642(c)(1) merely refers to gross income and does not otherwise incorporate § 170's discussion of the fair market value of donated real property. Presumably, had Congress intended for the concept of "gross income" in this instance to extend to unrealized gains on property purchased with gross income, it would have said so.

25

*The Trust's § 512(b)(11) theory*

That leaves one remaining issue we must address. In its appellate response brief, the Trust argues, in part, that the "Donated Properties were allocable to the Trust's UBI [unrelated business income]" and that, consequently, 26 U.S.C. § 512(b)(11) "provides an alternative path for a deduction for charitable contributions by a trust that are sourced from UBI." Aplee. Br. at 26-27. More specifically, the Trust argues that through the operation of § 512(b)(11), its "contribution of the Donated Properties was . . . deductible under § 170," and "[b]ecause § 170 unquestionably applies a fair market value standard to the value of donated noncash property, it follows that the Trust was permitted to deduct the Donated Properties at fair market value, subject only to the 50% limitation imposed by § 170(b)(1)(A)." Id. at 29. The government, in its appellate reply brief, argues that the Trust "never raised this argument in its refund claim" and thus we "lack[] jurisdiction to consider it under the variance doctrine." Aplt. Reply Br. at 26.

"A taxpayer may not sue the United States for the recovery of income taxes unless it has timely filed a refund claim at the [IRS] in the manner prescribed by regulation." Lockheed Martin Corp. v. United States, 210 F.3d 1366, 1371 (Fed. Cir. 2000) (citing 26 U.S.C. § 7422(a)). "The regulations require that the

26

taxpayer submit with its tax refund claim the supporting evidence necessary to prove its claim." Id. (citing Treasury Reg. § 301.6402-2(a)). In addition, the regulations expressly state that:

> No refund or credit will be allowed after the expiration of the statutory period of limitation applicable to the filing of a claim therefor except upon one or more of the grounds set forth in a claim filed before the expiration of the period. The claim must set forth in detail each ground upon which a credit or a refund is claimed and in facts sufficient to apprise the Commissioner of the exact basis thereof.

Treasury Reg. § 301.6402–2(b)(1). "This regulation distinguishes between the ground for the claim—that is, the legal theory upon which the refund is claimed—and facts 'sufficient to apprise the Commissioner of the exact basis thereof.'" Lockheed, 210 F.3d at 1371.

Together, § 7422(a) and Treasury Reg. § 301.6402-2(b)(1) give rise to what courts have described as the "substantial variance" rule. Id. This rule "bars a taxpayer from presenting claims in a tax refund suit that 'substantially vary' the legal theories and factual bases set forth in the tax refund claim presented to the IRS." Id. Of relevance here, "'[a]ny legal theory not expressly or impliedly contained in the application for refund cannot be considered by a court in which a suit for refund is subsequently initiated.'" Id. (quoting Burlington N. Inc. v. United States, 684 F.2d 866, 868 (Ct. Cl. 1982)).

As the government correctly notes, the Trust's refund claim made no mention of its § 512(b)(11) legal theory. See App., Vol. 1 at 75-77. We therefore

27

agree with the government that the § 512(b)(11) arguments contained in the Trust's appellate response brief constitute a substantial variance of the legal component of refund claim it originally filed with the IRS. These arguments are thus barred by the substantial variance rule.

In addition, we note that the Trust's § 512(b)(11) theory was never clearly raised in or resolved by the district court. To begin with, the complaint made no mention of § 512(b)(11). In turn, the Trust's motion for partial summary judgment focused exclusively on the amount of the deduction that was allowable under § 642(c)(1). To be sure, the Trust stated in a footnote that a § 642(c)(1) "deduction is subject to a limitation for amounts allocable to unrelated taxable income ('UBTI')." App., Vol. I at 190. But immediately following that statement, the Trust in turn stated: "There may be a dispute in this case regarding Trustee's UBTI calculation, but that is beyond the scope of this motion." Id. The government, in its own motion for summary judgment, also focused exclusively on the amount of the deduction allowed under § 642(c)(1). Nowhere did the government discuss or even cite to § 512(b)(11). Ultimately, the district court, in its order granting partial summary judgment in favor of the Trust, did not attempt to determine how much, if any, of the money spent to purchase the properties came from the Trust's UBTI, and in turn did not address the Trust's purported entitlement to a deduction under § 512(b)(11). All of which means that, independent of the substantial variance rule, the issue has been waived by the

28

Trust.  See Campbell v. City of Spencer, 777 F.3d 1073, 1080 (10th Cir. 2014) ("We have held that an appellant waives an argument if she fails to raise it in the district court and has failed to argue for plain error and its application on appeal.").

## III

The Trust's motion to file a surreply brief is GRANTED.  The judgment of the district court is REVERSED and the case REMANDED to the district court with directions to enter summary judgment in favor of the government.