T.C. Memo. 2020-89

UNITED STATES TAX COURT

DAVID F. HEWITT AND TAMMY K. HEWITT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23809-17.                    Filed June 17, 2020.

<u>Michelle A. Levin</u>, <u>David M. Wooldridge</u>, <u>Ronald A. Levitt</u>, and <u>Gregory P. Rhodes</u>, for petitioners.

<u>Edwin B. Cleverdon</u>, <u>Jerrika C. Anderson</u>, and <u>Horace Crump</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  In 2012 petitioner David Hewitt granted a conservation easement to a qualified organization under section 170(h)(3) on rural farm land

[*2] that has been in his family for nearly 60 years.[1]  Growing up, he worked on the farm with his father, and he has lived on the property throughout his life. Petitioners claimed a charitable contribution deduction of approximately $2.8 million for the easement donation on their joint 2012 tax return and carried over portions of the contribution for 2013 and 2014.  Respondent has not challenged the deduction claimed on the 2012 return but has disallowed the carryover deductions for 2013 and 2014.  The primary issue for decision is whether petitioners are entitled to carryover of the charitable contribution deduction for the donation of the conservation easement; we hold they are not.[2]  The easement does not protect the conservation purposes of the contribution in perpetuity as required by section 170(h)(5) because the deed would not allocate to the donee a share of the proceeds in the event the property is sold following a judicial extinguishment of the easement, in violation of section 1.170A-14(g)(6)(ii), Income Tax Regs.[3]

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code (Code) in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.  Some dollar and acreage amounts are rounded.

[2]Petitioners concede to $31,771 in unreported long-term capital gain as determined in the notice of deficiency.  Respondent has conceded any penalty related to this amount.

[3]Respondent alternatively argues that the deed fails sec. 170(h)(5) because it
(continued...)

**[*3]**  Respondent determined 40% accuracy-related penalties against petitioners

for gross valuation misstatements under section 6662(e) and (h) and 20%

accuracy-related penalties for negligence or disregard of rules and regulations or

substantial understatements of income tax under section 6662(a) and (b)(1) and (2)

for 2013 and 2014.  We find petitioners not liable for the penalties.

FINDINGS OF FACT

Petitioners resided in Alabama when they filed their petition.  Mr. Hewitt

was the sole owner of the easement property but filed joint returns with his wife

for the years at issue.  Mr. Hewitt's father moved to Alabama in the early 1950s

and acquired land to raise cattle, farm, and harvest timber.[4]  When Mr. Hewitt was

---

[3](...continued)
allows a merger of the estates and fails sec. 170(h)(2) because it does not desig-
nate the location for five homesites reserved in the deed.  Sec. 170(h)(2)(C)
requires the deed to place "a restriction (granted in perpetuity) on the use" of the
property.  Mr. Hewitt intended the homesites for his children so that they may be
able to live on the property one day.  Petitioners contend that the delay in desig-
nating the homesite locations would better protect the easement's conservation
purposes.  We have held that a reserved right to construct a residential subdivision
without designating the location at the outset violates sec. 170(h)(2).  Pine Moun-
tain Pres., LLLP v. Commissioner, 151 T.C. 247 (2018), appeal filed (11th Cir.
May 7, 2019); Carter v. Commissioner, T.C. Memo. 2020-21, at *19.  Petitioners
seek to distinguish Pine Mountain.  However, for them to qualify for the deduc-
tion, the deed must satisfy both sec. 170(h)(2) and (5).  Accordingly, we do not
address the sec. 170(h)(2) issue.

[4]Petitioners' opening brief lists no proposed findings of fact in the form of
(continued...)

[*4] a child, his family lived on the land, and he grew up helping his father on the farm and continued to work on the farm while in college.

In the early 1990s Mr. Hewitt's father transferred a large portion of his land to Mr. Hewitt's sister. In 1997 and 1998 the sister transferred a portion of the land, 232 acres, to Mr. Hewitt as a gift. In 2001 Mr. Hewitt purchased 25 more acres of adjacent land. He bought out the interests of two unrelated persons who co-owned a 400-acre parcel with his father. He granted the conservation easement on a portion of the land he acquired in these transfers. In 2012 Mr. Hewitt and his sister owned approximately 1,325 acres in Randolph and Cleburne Counties, Alabama, near Alabama's border with Georgia (Hewitt property).

The Hewitt property consisted of pastureland along a county road and wooded areas with steep topography, rough terrain, and limited road access. It is approximately a one-hour drive from Atlanta, Georgia, and a little more than one

---

4(...continued)
numbered statements as required by Rule 151(e)(3) and includes some recital of testimony. Respondent argues that because of this noncompliance with our Rules we should adopt his proposed findings of fact as fully and fairly presenting all relevant facts. We have considered petitioners' noncompliance but do not fully adopt respondent's proposed findings. See Beane v. Commissioner, T.C. Memo. 2009-152, slip op. at 7 (adopting the Commissioner's proposed findings because the taxpayer's briefs did not comply with Rule 151(e) and "did not assist the Court in making sense of a voluminous and confusing record").

[*5] hour from Birmingham, Alabama.  There were no zoning ordinances on the property when Mr. Hewitt granted the easement.

In 2012 the father's health had begun to decline.  Mr. Hewitt saw that his father continued to enjoy the land as his health failed and he had difficulty communicating.  Mr. Hewitt decided that he wanted to preserve the land because of his father.  He also wanted his children and future generations to have the same opportunity that he had had to enjoy and live on the land.  He decided to place a conservation easement on the property.  A business acquaintance referred him to the accounting firm Large & Gilbert, P.C. (Large & Gilbert), because of its experience with the donation of conservation easements.  Mr. Hewitt met with members of Large & Gilbert.  He believed that Large & Gilbert was well respected in the tax community.  Large & Gilbert recommended that Mr. Hewitt grant the easement to Atlantic Coast Conservancy, Inc. (Conservancy), a qualified organization under section 170(h)(3).  Mr. Hewitt met with Robert Keller, a conservation biologist and the Conservancy's founder and chief executive officer, to discuss the possible donation of the easement.  Dr. Keller visited the Hewitt property to gather information about it.  The Conservancy prepared baseline reports on the easement's conservation goals.

[*6]  Mr. Hewitt decided to grant an easement on 257 acres of his property that contained pastureland and was accessible from paved roadways.  He chose this area because he believed that it was the most likely to be developed and he wanted to protect it.  He understood that development of the wooded, hilly area would be costly and believed it was less necessary to protect that portion of the Hewitt property.  In his opinion the pastureland was significantly more valuable than the wooded area.  He intended to protect the easement property in perpetuity.

On December 28, 2012, Mr. Hewitt granted a conservation easement over 257 acres to Pelican Coast Conservancy, Inc., a wholly owned subsidiary of the Conservancy (collectively, Conservancy), through a deed of conservation easement.  According to the deed the easement's purposes are to preserve and protect the scenic enjoyment of the land, agricultural land and production, and a creek within the Tallapoosa Basin watershed.  The deed states that the easement will maintain the amount and diversity of natural habitats, protect scenic views from the roads, and restrict the construction of buildings and other structures, the removal or destruction of native vegetation, changes to the habitat, and the exploration of minerals, oil, gas, or other materials.  It prohibits Mr. Hewitt from undertaking any activity that is inconsistent with the easement's purposes and grants to the Conservancy the right to prevent any activity or use of the easement

**[*7]** property that is inconsistent with the easement's purposes or adversely affects its conservation values.

Notwithstanding the above restrictions, Mr. Hewitt reserved the right to locate five one-acre homesites with one dwelling on each homesite. He intended the homesites to be used by his children if they wanted to live on the family property some day. The deed does not designate the locations of the homesites and allows them to be located on a substantial portion of the 257-acre easement property. The deed requires Mr. Hewitt to provide written notice to the Conservancy that he intends to exercise his right to designate a homesite. The notice must describe the chosen location "in sufficient detail to permit [the] Conservancy to make an informed judgment as to its consistency with the purpose of this Easement". The Conservancy has the right to grant or withhold its approval within 60 days of receiving Mr. Hewitt's written notice. It may withhold approval only if it reasonably determines that the proposed location is inconsistent with or impairs the easement's purposes. Mr. Hewitt and the Conservancy must set the homesite location 60 days before construction begins. The Conservancy believed that the delay in designating the homesite locations would give it flexibility to take into account the natural changes to the land from wildlife

**[*8]** migration and topography over the time before the homes are constructed and would better protect the easement's conservation purposes.

The deed provides for the allocation of proceeds from an involuntary extinguishment as follows:

> [T]his Easement shall have at the time of Extinguishment a fair market value determined by multiplying the then fair market value of the Property unencumbered by the Easement (minus any increase in value after the date of this grant attributable to improvements) by the ratio of the value of the Easement at the time of this grant to the value of the Property, without deduction for the value of the Easement, at the time of this grant. * * * [T]he ratio of the value of the Easement to the value of the Property unencumbered by the Easement shall remain constant.

The Conservancy drafted the deed relying on published guidance from Land Trust Alliance, a national land trust organization. Large & Gilbert reviewed the deed and advised Mr. Hewitt that it complied with the requirements of the Code and the accompanying regulations.

Mr. Hewitt did not grant an easement over all the property that he owned, and he and his sister continued to own 1,070 acres unencumbered and contiguous with the easement property (contiguous property). After granting the easement Mr. Hewitt continued to live on the land and use it for cattle ranching.

On their 2012 joint tax return petitioners claimed a charitable contribution deduction for the easement donation of $2,788,000. Their deduction for 2012 was

[*9] limited to $57,738 by section 170(b)(1)(A).[5]  They timely filed their joint tax returns for 2013 and 2014 and claimed carryover deductions from the 2012 easement donation of $1,868,782 and $861,480, respectively.  Large & Gilbert prepared petitioners' 2012, 2013, and 2014 returns.  Petitioners attached Form 8283, Noncash Charitable Contributions, to their 2012 return but did not report the basis in the easement property on the form.  Mr. Hewitt attempted to determine his basis in the easement property, which was primarily a carryover basis from his father.  He asked his father how much he had paid for the property and tried to find the original purchase documents.  He was unable to obtain any cost basis information.  He provided Large & Gilbert with the deeds for his sister's gifts of the land.

Large & Gilbert advised Mr. Hewitt that he could attach a statement to Form 8283 stating that basis information was not available and the deduction would not be disallowed on this basis.  Petitioners attached the following statement prepared by Large & Gilbert to Form 8283:

> A declaration of the taxpayer's basis in the property is not included because of the fact that the basis of the property remains to be determined with accuracy; in addition, the basis [is] not taken into

---

[5]An individual taxpayer's charitable contribution deductions are limited to 50% of his adjusted gross income, and the taxpayer may carry over the excess contributions for five years.  Sec. 170(b)(1)(A), (d).

[*10] consideration when computing the amount of the deduction. Furthermore, the taxpayer has a holding period in the property in excess of 12 months and the property otherwise qualifies as capital gains property.

Petitioners attached an appraisal of the easement prepared by Jim Clower. Large & Gilbert had recommended Mr. Clower. Mr. Hewitt understood that Mr. Clower was competent and experienced. Mr. Clower used a before and after valuation method and determined that the easement property had a value of $3,214,000 unencumbered by the easement (before value) and a value of $420,000 encumbered by the easement (after value). He determined that the value of the contiguous property increased by $6,500 as a result of the easement (enhancement value). He concluded that the easement had a fair market value of $2,787,500, the difference between the before and after values less the enhancement value.

Mr. Hewitt reviewed the appraisal report and believed that the appraised value was reasonable and consistent with his own opinion of the land's value. Subsequently, he purchased 79 acres of nearby wooded land with steep topography and limited public access comparable to the contiguous property for $1,582 per acre and a .72-acre parcel adjacent to the easement property and with topography comparable to the easement property for $12,000. Mr. Clower did not testify at trial, and his appraisal was not received into evidence for purposes of its

[*11] valuation. The parties stipulated that Mr. Clower's appraisal was a qualified appraisal by a qualified appraiser.

Respondent did not issue a notice of deficiency for 2012 and did not challenge petitioners' use of $57,738 of the easement deduction for that year. Respondent issued a notice of deficiency for 2013 and 2014, disallowing the carryover deductions on the basis of a lack of substantiation and determining section 6662(h) 40% penalties for a gross valuation misstatement and, alternatively, section 6662(a) 20% penalties for negligence or disregard of the rules and regulations or substantial understatements of income tax. Respondent has not asserted or argued that the easement had no value.

After 2012 Mr. Hewitt continued his land purchases. He granted conservation easements on some of the land with the help of Large & Gilbert. He held that land through pass-through entities that would grant the easements. Petitioners recognized gain of over $3.5 million on the sale of interests in these entities to investors who could claim shares in the easement deductions. Respondent alleges that these entities overvalued the conservation easements for purposes of the deductions. Individuals from Large & Gilbert invested in the entities and claimed easement deductions.

[*12] Both parties presented expert witnesses. Petitioners presented three expert witnesses, Beau Bevis, Grant McCaleb, and Raymond Veal. Mr. Bevis opined the highest and best use of the easement property was the development of a mobile home community. Mr. McCaleb provided estimates of construction costs for the mobile home community. Mr. Veal is a valuation expert and opined that the easement's fair market value was approximately $3.1 million. Respondent presented George Petkovich as a valuation expert. He opined the easement's fair market value was $190,000.

OPINION

Section 170(a)(1) allows taxpayers to deduct charitable contributions made within the taxable year. If the taxpayer makes a charitable contribution of property other than money, the amount of the contribution is generally equal to the donated property's fair market value at the time of the donation. Sec. 1.170A-1(c)(1), Income Tax Regs. Generally, a taxpayer is not entitled to deduct the donation of "an interest in property which consists of less than the taxpayer's entire interest in such property". Sec. 170(f)(3)(A). An exception is made for a contribution of a partial interest in property that constitutes a "qualified conservation contribution". Id. subpara. (B)(iii). The exception applies where: (1) the taxpayer donates a "qualified real property interest", (2) the donee is "a

**[\*13]** qualified organization", and (3) the contribution is "exclusively for conservation purposes." Id. subsec. (h)(1). The donation must satisfy all three requirements. Irby v. Commissioner, 139 T.C. 371, 379 (2012).

Respondent argues that the contribution is not exclusively for conservation purposes. A contribution is "exclusively for conservation purposes" if its conservation purpose is "protected in perpetuity". Sec. 170(h)(5)(A) (perpetuity requirement).

## I.    Perpetuity Requirement

The regulations interpreting the perpetuity requirement recognize that "a subsequent unexpected change in the conditions surrounding the property * * * can make impossible or impractical the continued use of the property for conservation purposes". Sec. 1.170A-14(g)(6)(i), Income Tax Regs. In such an event the easement would not be protected in perpetuity. However, the regulation (extinguishment regulation) provides a means that the perpetuity requirement may be deemed satisfied: "[T]he conservation purpose can nonetheless be treated as protected in perpetuity if the restrictions are extinguished by judicial proceeding" and the donee uses "all of the donee's proceeds * * * from a subsequent sale or exchange of the property * * * in a manner consistent with the conservation purposes of the original contribution." Id.

**[\*14]** Section 1.170A-14(g)(6)(ii), Income Tax Regs. (proceeds regulation), determines the donee's share of the extinguishment proceeds as follows:

> [A]t the time of the gift the donor must agree that the donation of the perpetual conservation restriction gives rise to a property right, immediately vested in the donee organization, with a fair market value that is at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift, bears to the value of the property as a whole at that time. * * * [T]hat proportionate value of the donee's property rights shall remain constant. Accordingly, when a change in conditions give rise to the extinguishment of a perpetual conservation restriction * * * the donee organization, on a subsequent sale, exchange, or involuntary conversion of the subject property, must be entitled to a portion of the proceeds at least equal to that proportionate value of the perpetual conservation restriction, unless state law provides that the donor is entitled to the full proceeds * * *

The deed subtracts the value of posteasement improvements before determining the Conservancy's share of the extinguishment proceeds and fails to allocate the extinguishment proceeds in accordance with the proceeds regulation. See Coal Prop. Holdings, LLC v. Commissioner, 153 T.C. 126, 138-139 (2019); see also PBBM-Rose Hill, Ltd. v. Commissioner, 900 F.3d 193, 208 (5th Cir. 2018). The proceeds regulation does not permit the value of posteasement improvements to be subtracted from the proceeds before determining the donee's share. Coal Prop. Holdings, LLC v. Commissioner, 153 T.C. at 138-139 (holding that a deed that subtracts the value of posteasement improvements fails the section

**[*15]** 170(h)(5) perpetuity requirement); <u>Oakbrook Land Holdings, LLC v.</u>

<u>Commissioner</u>, T.C. Memo. 2020-54, at *40-*41.  The proceeds regulation is not

satisfied, and the easement's conservation purposes are not protected in perpetuity.

Accordingly, petitioners are not entitled to the carryover deductions for 2013 and

2014 for the easement donation.

A.    <u>Petitioners' Interpretation of the Regulation</u>

Petitioners argue that our caselaw misinterprets the proceeds regulation.[6]  In

making this argument, they maintain that we should liberally construe the

proceeds regulation in the favor of taxpayers.  Generally, we consider deductions a

matter of legislative grace and strictly construe their provision.  <u>INDOPCO, Inc. v.</u>

<u>Commissioner</u>, 503 U.S. 79, 84 (1992).  However, courts have liberally construed

statutory provisions for charitable contribution deductions in the taxpayer's favor

or have interpreted them under the ordinary standard of statutory construction

because such deductions are an expression of public policy rather than legislative

grace.  <u>See</u> <u>Helvering v. Bliss</u>, 293 U.S. 144, 150-151 (1934); <u>PBBM-Rose Hill,</u>

<u>Ltd. v. Commissioner</u>, 900 F.3d at 200 (applying ordinary standard of construction

---

[6]Alternatively, petitioners challenge the regulation's procedural and substantive validity.  We upheld the procedural and substantive validity of the proceeds regulation in <u>Oakbrook Land Holdings, LLC v. Commissioner</u>, 154 T.C. __, __ (slip op. at 25, 28-31) (May 12, 2020).

**[\*16]** and agreeing with our interpretation); <u>Green v. United States</u>, 880 F.3d 519, 529 (10th Cir. 2018); <u>BC Ranch II, L.P. v. Commissioner</u>, 867 F.3d 547, 553-554 (5th Cir. 2017), <u>vacating and remanding</u> <u>Bosque Canyon Ranch, L.P. v. Commissioner</u>, T.C. Memo. 2015-130; <u>Weingarden v. Commissioner</u>, 825 F.2d 1027, 1030 (6th Cir. 1987) (interpreting "redundant, ambiguous, and opaque nature" of the statute in the taxpayer's favor), <u>rev'g</u> 86 T.C. 669 (1986); <u>Rockefeller v. Commissioner</u>, 676 F.2d 35, 42 (2d Cir. 1982) ("Courts have consistently reaffirmed that public policy demands a broad and flexible interpretation of statutes governing charitable contributions."), <u>aff'g</u> 76 T.C. 178 (1981).

We are interpreting a regulatory provision, not a statute. The statute is silent as to the effect of a possible extinguishment of the conservation easement. In the event of an extinguishment the perpetuity requirement could not be met even if we liberally construed section 170(h)(5). Section 1.170A-14(g)(6), Income Tax Regs., provides a means by which the perpetuity requirement is deemed satisfied. <u>Coal Prop. Holdings, LLC v. Commissioner</u>, 153 T.C. at 135-136. We are interpreting a regulation that creates "a single--and exceedingly narrow-- exception" to the statutory requirements for a conservation easement deduction. <u>Belk v. Commissioner</u>, 774 F.3d 221, 225 (4th Cir. 2014), <u>aff'g</u> T.C. Memo.

**[\*17]** 2013-154, <u>supplementing</u> 140 T.C. 1 (2013).  For this reason we strictly construe section 1.170A-14(g)(6), Income Tax Regs.[7]  Carroll v. Commissioner, 146 T.C. 196, 212 (2016).

Turning to petitioners' interpretation of the regulation, they argue that references to "the property" and "the subject property" in subdivisions (i) and (ii), respectively, of section 1.170A-14(g)(6), Income Tax Regs., mean the donee's right to any extinguishment proceeds is limited to the proceeds from the property as it existed at the time of the easement's grant, which necessarily excludes posteasement improvements.  They argue that the donee has a property right only to the proceeds attributable to "a defined parcel" at the easement's grant, borrowing a phrase used by the Court of Appeals for the Fourth Circuit in Belk v. Commissioner, 774 F.3d 221, to interpret section 170(h)(2), which requires a use restriction to be placed on the donated property in perpetuity.  See Pine Mountain Pres., LLLP v. Commissioner, 151 T.C. 247, 275 (2018) (adopting the "defined parcel" terminology), appeal filed (11th Cir. May 7, 2019).  To further support their interpretation, they cite the statement in the proceeds regulation that the donee is to receive a "property right, immediately vested" and argue that a donee

---

[7]The Court of Appeals for the Fifth Circuit disallowed the deduction under the ordinary standard of construction of the proceeds regulation.  PBBM-Rose Hill, Ltd. v. Commissioner, 900 F.3d 193, 200 (5th Cir. 2018).

**[\*18]** cannot receive an immediately vested property right in improvements that do not exist.

The extinguishment regulation requires the donee to use its "proceeds * * * from a subsequent sale or exchange of the property * * * in a manner consistent with the conservation purposes of the original contribution." Sec. 1.170A-14(g)(6)(i), Income Tax Regs. Petitioners argue that "the original contribution" limits the donee's share of the proceeds to the value of the property as it existed when the easement was granted. The extinguishment regulation does not support petitioners' argument. It refers to the original contribution to determine for what purpose the donee must use its share of the proceeds. It does not define the donee's share of the proceeds.

Likewise, petitioners misinterpret "the subject property" in the proceeds regulation. The proceeds regulation provides the manner to determine the donee's share of the proceeds "on a subsequent sale, exchange, or involuntary conversion of the subject property". Section 1.170A-14(g)(6), Income Tax Regs., addresses two separate events: a judicial extinguishment of the easement followed by the sale of the property. The subject property refers to the property that is sold that generates the proceeds after the easement is extinguished. It does not refer to the property that existed at the outset. Nor does it define the donee's property right to

[*19] the proceeds. The donee's property right is the right to the perpetual conservation restriction; this is the right that is immediately vested. That property right is defined as the proportionate value without any limitation to the property that existed at the outset. The proceeds regulation does not limit the donee's share to the value of the real property as it existed when the easement was granted. We adhere to our caselaw. The value of posteasement improvements may not be subtracted out of the proceeds before determining the donee's proportionate share. See Coal Prop. Holdings, LLC v. Commissioner, 153 T.C. 126; Oakbrook Land Holdings, LLC v. Commissioner, T.C. Memo. 2020-54.

Finally, there is no defined parcel requirement for section 170(h)(5). Section 170(h)(2) and (5) sets forth separate and distinct but not "wholly unrelated" requirements. Carter v. Commissioner, T.C. Memo. 2020-21, at *19; see Belk v. Commissioner, 140 T.C. at 12. Section 170(h)(2)(C) requires a perpetual restriction "on the use which may be made of the real property." Quite simply, there cannot be a perpetual use restriction if the property to which the restriction applies is not defined at the outset. Section 170(h)(5) requires that the contribution be exclusively for conservation purposes; it does not concern a defined parcel. In fact the regulations recognize that the donor's right to make changes to the property. Sec. 1.170A-14(g)(1), Income Tax Regs. The donee's

[*20] immediately vested property right is to the perpetual restrictive covenant, not a defined parcel of land.  For purposes of the extinguishment provisions, the subject property may change, but the donee's property right to the extinguishment proceeds may not.

B.      Deference to Private Letter Ruling

Petitioners argue that respondent has improperly changed his interpretation of the proceeds regulation from that in a 2008 private letter ruling, to the detriment of taxpayers without any notice.  Priv. Ltr. Rul. 200836014 (June 3, 2008).  We have refused to give any weight to the 2008 private letter ruling, finding the proceeds regulation unambiguous.  Coal Prop. Holdings, LLC v. Commissioner, 153 T.C. at 143-144; see also PBBM-Rose Hill, Ltd. v. Commissioner, 900 F.3d at 208 (finding the proceeds regulation unambiguous in its use of the word "proceeds" does not permit subtracting the value of posteasement improvements when determining the donee's share).  Petitioners argue that this refusal was in error because private letter rulings can be "significant" where the Internal Revenue Service (IRS) later reverses its position.  Hanover Bank v. Commissioner, 369 U.S. 672, 686-687 (1962); see Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 156 (2012) ("[A]gencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'" (alteration in original)

**[\*21]** (quoting <u>Gates & Fox Co. v. Occupational Safety & Health Review</u>

<u>Comm'n</u>, 790 F.2d 154, 156 (D.C. Cir. 1986))). Our caselaw has not addressed

the impact of the IRS' purported reversal of the position of a private letter ruling.

Petitioners further argue that we should consider the 2008 private letter

ruling because the Court of Appeals for the Eleventh Circuit, to which this case is

appealable, has recognized that while not binding precedent under section

6110(k)(3) courts may treat private letter rulings as "persuasive authority because

they 'do reveal the interpretation put upon the statute by the agency charged with

the responsibility of administering the revenue laws.'" <u>Davis v. Commissioner</u>,

716 F.3d 560, 569 n.26 (11th Cir. 2013) (quoting <u>Hanover Bank v. Commissioner</u>,

369 U.S. at 687), <u>aff'g</u> T.C. Memo. 2011-286; <u>see</u> sec. 6110(k)(3) (providing that

written determinations such as private letter rulings cannot be cited as precedent).

The 2008 private letter ruling is neither persuasive nor relevant. While it

involves an easement deed that subtracted the value of posteasement

improvements from the extinguishment proceeds, it makes no more than a passing

reference to the deed's proceeds provision and does not evaluate whether the

subtraction violates the perpetuity requirement of section 170(h)(5). There is no

indication that its author analyzed the proceeds regulation or the deed's proceeds

provision. To warrant deference the agency's interpretation must reflect "the

[*22] agency's fair and considered judgment on the matter in question." Auer v. Robbins, 519 U.S. 452, 462 (1997). The 2008 private letter ruling does not indicate that the author considered the text of the proceeds regulation or interpreted it to allow the subtraction of the value of posteasement improvements. Respondent's current position is not a new or different interpretation. We adhere to our prior position that the 2008 private letter ruling is not entitled to any weight.

C.   State Law Exception

The proceeds regulation provides an exception to the proportionate share requirement if applicable State law allows the donor to receive "the full proceeds from the conversion without regard to the terms of the prior perpetual conservation restriction." Sec. 1.170A-14(g)(6)(ii), Income Tax Regs. Petitioners argue that Alabama law allocates the full amount of any extinguishment proceeds to the donor, citing Burma Hills Dev. Co. v. Marr, 229 So. 2d 776 (Ala. 1969), making the proportionality formula irrelevant. Burma Hills involved a mutually restrictive covenant applicable to all property within a residential subdivision. A neighboring landowner sued the condemning authority for violating the restrictive covenant on another person's property. The court refers to a mutually restrictive covenant as an equitable easement in favor of the property owners who have the right to enforce the covenant. Id. at 778. However, such a covenant does not

**[*23]** create a property right entitling the restricted property owners to compensation in a condemnation proceeding of the servient estate. Id. at 782.

The Conservancy has a property right granted by a deed of easement, not a mere covenant. Under Alabama law a conservation easement is defined as "[a] nonpossessory interest of a holder in real property". Ala. Code. sec. 35-18-1(1) (1997). Such an easement is a property right that entitles the easement holder to compensation for the taking of the easement.[8] Portersville Bay Oyster Co. v. Blankenship, 275 So. 3d 124, 134 (Ala. 2018); see Ala. Code sec. 35-18-2(e) (1997) ("A conservation easement may be condemned * * * through eminent domain in the same manner as any other property interest."). Under Alabama law where property that is held in multiple estates is taken by eminent domain, each estate owner has a corresponding right to share in the condemnation award and the award is apportioned among the estate holders in accordance with their respective ownership interests. Harco Drug, Inc. v. Notsla, Inc., 382 So. 2d 1, 3 (Ala. 1980) (holding a lessee and a lessor are both estate holders and entitled to damages in a condemnation proceeding).

---

[8]A conservation easement may be condemned through eminent domain. Ala. Code sec. 35-18-2(e) (1997). The statute does not expressly state that the easement holder is entitled to compensation.

[*24] The donor would not be entitled to the full amount of the proceeds from a judicial extinguishment under Alabama law.  The State law exception of the proceeds regulation does not apply.  Accordingly, for the donor to qualify for the charitable contribution deduction for the conservation easement, the deed must satisfy the allocation of the extinguishment proceeds set forth in the proceeds regulation.  The deed did not properly allocate the extinguishment proceeds in accordance with the regulation, and the deduction is disallowed.

II.    Accuracy-Related Penalties

Respondent determined that petitioners are liable for 40% penalties for gross valuation misstatements under section 6662(h) and, alternatively, 20% penalties under section 6662(a) and (b)(1) and (2) for negligence or disregard of rules or regulations and substantial understatements of income tax for 2013 and 2014.

A.    Gross Valuation Misstatement Penalty

Taxpayers who meet the technical requirements for a charitable contribution of a conservation easement may deduct the easement's fair market value.  Sec. 170(c)(1).  A gross valuation misstatement occurs when a taxpayer reports a value for the donated property that is 200% or more of the correct amount.  Sec. 6662(h)(2).  On their 2012 return petitioners claimed an easement deduction of

**[\*25]** $2,788,000.  If we find that the easement's fair market value is $1,394,000 or less, there is a gross valuation misstatement as the claimed deduction is more than 200% of the correct amount.  Respondent has the burden of production with respect to the penalties.  RERI Holdings I, LLC v. Commissioner, 149 T.C. 1, 37 (2017), aff'd sub nom. Blau v. Commissioner, 924 F.3d 1261 (D.C. Cir. 2019).  Reasonable cause is not available as a defense to the gross valuation misstatement penalty with respect to the deduction of a charitable contribution of property.  Sec. 6664(c)(3).

When there is a substantial record of sales of the comparable easements, the donated easement's fair market value is based on the sale prices of those comparable easements.  Sec. 1.170A-14(h)(3)(i), Income Tax Regs.  Because sales of conservation easements are rare, the regulations provide a "before and after" method to value the easement.  Id. subdiv. (ii).  Under the before and after method, the easement's fair market value is the difference between the fair market value of the property unencumbered by the easement (before value) and its fair market value after the easement's grant (after value).  Id.  When the donor owns additional unencumbered property contiguous with the easement property, the before and after method valuation must take into account any enhancement value of the contiguous property as a result of the easement.  Id.

**[\*26]** When ascertaining the before and after values of easement property, an appraiser may use the comparable sales method or another accepted method. Hilborn v. Commissioner, 85 T.C. 677, 688-689 (1985). The comparable sales method requires that the comparable properties be similar in nature to the donated property and that the sales be in arm's-length transactions within a reasonable time of the donation. Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19 (1979). It may be appropriate to make adjustments to the sale prices of the comparable properties to account for differences in the time of the sale and the size or other features of the donated property. Id.

Fair market value is generally determined on the basis of the highest and best use of the donated property. Hilborn v. Commissioner, 85 T.C. at 689-690. The highest and best use is "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future". Olson v. United States, 292 U.S. 246, 255 (1934); Symington v. Commissioner, 87 T.C. 892, 897 (1986) (quoting Olson). It does not depend on whether the owner has actually put the property to such use or whether he ever intends to do so. Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986). However, absent proof to the contrary the property's current use is presumed its highest and best use. Estate of Pulling v. Commissioner, T.C. Memo.

**[\*27]** 2015-134, at \*14.  Highest and best use is a question of fact.  <u>Stanley Works & Subs. v. Commissioner</u>, 87 T.C. at 408.  But it requires an objective assessment of the likelihood that the donated property would be put to its highest and best use.  Sec. 1.170A-14(h)(3)(ii), Income Tax Regs.  The differences between the parties' experts center on their opinions of the highest and best use of the easement property before the easement's grant, in particular whether easement and noneasement portions of the Hewitt property had different highest and best uses.[9]

We consider expert opinions to assist us with understanding the evidence or determining facts in issue.  Fed. R. Evid. 702.  We evaluate expert opinions on the fair market value of property in the light of the experts' demonstrated qualifications and all other evidence in the record.  <u>See</u> <u>Parker v. Commissioner</u>, 86 T.C. 547, 561 (1986).  When experts offer competing estimates of fair market value, we decide how to weigh those estimates by examining the factors the experts considered in reaching their conclusions.  <u>See</u> <u>Casey v. Commissioner</u>, 38 T.C. 357, 381 (1962).  We are not bound by the opinion of any expert witness and may accept or reject expert testimony in the exercise of sound judgment.

---

[9]Both valuation experts used incorrect acreage for the contiguous property, and they used different acreage.  After the parties submitted the expert reports, the parties stipulated the size of the contiguous property.  <u>See</u> Rule 91(a).  We find the errors insignificant to our determination of whether petitioners are liable for the gross valuation misstatement penalty.

[*28] Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990).

Respondent's expert, Mr. Petkovich, valued the easement on the basis of the highest and best use of the entire Hewitt property rather than the highest and best use of the easement property. He opined that the highest and best use before and after the easement's grant were generally the same, agricultural and low-density residential use on the pastureland and timber cultivation, passive recreation, and hunting in the wooded areas. He valued the entire Hewitt property (the contiguous and easement portions) at the same per-acre price of $1,850, or $2.6 million for the 1,325 acres, despite significant differences in the topography of the property and public access. He determined that there was no change to the after value of the noneasement portion. For his after value of the easement portion, he used a comparable sales method of properties subject to restrictive easements. He determined an after value for the easement portion of $1,100 per acre, or $282,920. He opined that the entire Hewitt property had an after value of $2.41 million, resulting in a $190,000 value for the easement.

Petitioners provided three expert witnesses. Mr. Bevis is the president of a local real estate company and has a master's degree in real estate development. He has over 20 years of experience in the commercial and residential real estate

[*29] business including experience in determining the highest and best use of land. He opined that the highest and best use of the easement property before the easement's grant was as a mobile home community, which could be sold to an investor once completed and leased. He opined its highest and best use after the easement's grant was agriculture and recreation. Mr. Bevis commissioned a market study and a proposed site plan for a mobile home community with 210 lots which he incorporated into his report. He testified that there was a need for affordable housing within 30 miles of the easement property. He testified that approximately 2,000 individuals commute to Randolph County daily. He opined that the proposed community would be fully occupied within three years.

Mr. Bevis opined that the proposed mobile home community could charge a monthly rent of $235 to $285. We find this range reasonable. He considered the monthly rents in Randolph County, which ranged from $125 to $200. He also considered the average monthly rents for mobile home communities in Birmingham and Atlanta of $267 and $379, respectively. He adjusted these rents downward to account for the rural location of the easement property and upward to account for the newness and better quality of the proposed mobile homes and amenities offered as compared to existing housing. Respondent objects to Mr. Bevis' testimony because he did not provide a detailed analysis of housing needs

[*30] or trends or provide supporting data for the three-year full occupancy assumption. However, we find his testimony reliable and helpful as he testified on the basis of his significant experience and knowledge of the market in which he worked.

Mr. McCaleb estimated construction costs of approximately $1.6 million for the proposed mobile home community with a club house and a pool. His estimate did not include all amenities proposed in Mr. Bevis' report. Respondent also objects to the site plan and cost estimate as vague and generalized. However, we find Mr. McCaleb's estimates sufficient for the limited purpose for which we rely on them, determining whether petitioners grossly misstated the easement's fair market value.

Petitioners offered Mr. Veal as a valuation expert. Mr. Veal valued only the 257-acre easement property, which he opined had a per-acre value different from the remainder of the Hewitt property. He opined that the easement property's highest and best use was as a mobile home community, relying, in part, on Mr. Bevis' conclusions. Mr. Veal determined the easement property had a before value of $3.5 million, approximately $13,600 per acre, and an after value of $340,000, approximately $1,200 per acre plus $5,000 for each homesite. He

[*31] determined an enhancement value of $55,000 for the Hewitt property not subject to the easement.

Mr. Veal used two valuation methods, income capitalization and comparable sales. For the income capitalization method, he used a monthly rent of $275 to project the net annual rental income for the proposed mobile home community for 2013 through 2015. Although $275 is on the higher end of Mr. Bevis' range for monthly rents, we find the amount reasonable. Mr. Veal also identified other sources of income such as wireless internet service fees that he included in his income computation. He opined that the revenue stream from the mobile home community had a discounted present value of $5.1 million, then deducted the construction costs estimated by Mr. McCaleb, resulting in a before value of $3.5 million for the easement, which he later revised to $3.4 million. See Trout Ranch, LLC v. Commissioner, T.C. Memo. 2010-283 (valuing real property by discounting the expected future cashflow from the property), aff'd, 493 F. App'x 944 (10th Cir. 2012). Using the comparable sales method, Mr. Veal determined that the proposed mobile home community could be sold for at least $7 million within three years of its construction. He then deducted $3.6 million for estimated construction costs and profit to the developer for a before value of $3.4 million. Reconciling his two methods, he determined a before value of $3.5

[*32] million.  He did not change this conclusion in his supplement to his report despite the reduction of the before value to $3.4 million under the income capitalization method.

Respondent identified issues with Mr. Veal's assumptions in both his valuation methods, such as the occupancy rate, and the lack of supporting data for Mr. Bevis' opinion on local housing needs.  Respondent also argues that the mobile home parks in Mr. Veal's comparable sales are not appropriate comparable properties because they had been in existence for 20 to 56 years.  We are convinced by respondent's argument that such established communities would sell for more than a newly constructed one.  Respondent did not consider the age of the mobile homes themselves or the age in relation to the useful lives of the mobile homes, which could negatively affect the values of the comparable properties.  Mr. Veal submitted a supplement to his report and admitted to errors in his analysis at trial.  At times he relied on incorrect or optimistic assumptions for the dates related to construction, leasing, and full occupancy of the mobile home community.  We find the incorrect assumptions and errors are not sufficient to discredit Mr. Veal's valuations in their entirety.

Furthermore, we find Mr. Petkovich's valuation significantly flawed.  He applied the same per-acre value to all 1,325 acres of the Hewitt property despite

[*33] significant differences in the topography of and public access to the easement and noneasement portions. We find this improper. Mr. Bevis testified that only the easement portion with its pastureland and public access was suitable for development and development in noneasement portion was cost prohibitive because of its wooded, rougher terrain and limited public access. At trial Mr. Petkovich acknowledged that the pastureland could have a different highest and best use from the timberland and is more valuable.

We find that Mr. Petkovich's comparable sales were problematic. He used sales of land similar in topography to the contiguous property and not significantly similar to the easement property, making his valuation unreliable. Each comparable property was wooded and lacked pastureland. We find on the basis of Mr. Hewitt's testimony and petitioners' experts' opinions that the pastureland differs significantly in value from the wooded land with steep or rough terrain where development is likely cost prohibitive. None of the comparable properties appears suitable for residential development. Mr. Petkovich identified the principal use of the comparable properties as recreation. Furthermore, two comparable properties sold in foreclosure.

Mr. Petkovich made adjustments to the sale prices of the comparable properties to account for qualitative differences with the Hewitt property, for

[*34] example, for location, shape, size, topography, and road and utility access. However, we find that the adjustments were inappropriate or insufficient to compensate for the differences between the comparable properties and the easement property especially in the light of the fact that Mr. Petkovich valued the entire Hewitt property. Moreover, while Mr. Petkovich listed over 10 characteristics of the properties for which he made price adjustments, he did not adequately explain the amount of the price adjustment for each characteristic or the method he used to determine the price adjustment. Finally, some adjustments are clearly inappropriate because he compared the entire Hewitt property rather than only the easement property. For example, he adjusted the sale prices of four comparable properties downward because of their relatively small sizes (approximately 200 acres) as compared to the 1,325-acre Hewitt property; but the easement property was only 257 acres.

As part of our analysis, we must consider the probability that the property would be developed as proposed and the market demand for the proposed community. Respondent has raised some legitimate concerns in this regard. However, we do not need to determine the easement's fair market value. We are determining whether petitioners overstated the value by 200%. We take into account the issues with Mr. Veal's valuation. However, significant elements of

[*35] his valuation and the proposed mobile home community were conservative. The proposed plan would place only 210 homes on 257 acres of land. This is a low-density residential use. Mr. Petkovich opined that the property was suitable for low-density residential use. The county's population of approximately 22,380 is stable, and the proposed community would add a small number of homes relative to the population. The median income in the county, approximately $35,000, would support the monthly rent that Mr. Veal used in the income capitalization method.

We find that petitioners did not grossly misstate the value of the easement by claiming a deduction of $2,788,000. Mr. Petkovich was unduly pessimistic in his valuation and incorrectly applied a uniform value to the entire Hewitt property. Our decision not to impose the gross valuation misstatement penalty does not depend solely on expert valuations. Mr. Hewitt gave credible testimony that the easement property was the most valuable part of the Hewitt property, confirming Mr. Bevis' and Mr. Veal's opinions. Mr. Hewitt believed that the easement property was the portion of his family's land that most needed protection from development. He has lived in Randolph County his entire life and has experience in land acquisition. We find his testimony helpful and reliable. He believed that the easement property had a before value of $12,000 to $15,000 per acre, a value

[*36] that would clearly make any penalty inapplicable. Mr. Hewitt purchased 79 acres of nearby wooded land with steep topography and limited public access, comparable to the unencumbered Hewitt property, for $1,582 per acre. This sale price aligns with Mr. Veal's valuation of the contiguous Hewitt property. In June 2014 Mr. Hewitt purchased a .72-acre parcel of land adjacent and comparable to the topography of the easement property for $12,000, which supports Mr. Veal's before value.

We find Mr. Hewitt's testimony regarding the value of his property persuasive. "[A] landowner is competent to offer opinion testimony with respect to the value of his or her property." Schmidt v. Commissioner, T.C. Memo. 2014-159, at *28. We have observed that a property owner "is qualified, by his ownership alone, to testify as to its value" and "the special knowledge accorded a property owner rests on a presumed familiarity with the property, knowledge or acquaintance with its uses and purposes, and experience in dealing with it." Estate of McCampbell v. Commissioner, T.C. Memo. 1991-141, 1991 WL 40519; see also LaCombe v. A-T-O, Inc., 679 F.2d 431, 433 (5th Cir. 1982) ("[T]he owner of property is qualified by his ownership alone to testify as to its value."). We find that the correct value of the easement was at least $1.4 million and petitioners are not liable for the section 6662(h) penalties.

**[\*37]** B.    <u>20% Accuracy-Related Penalties</u>

Respondent determined that petitioners are liable under section 6662(a) and (b)(1) and (2) for 20% accuracy-related penalties for 2013 and 2014 for underpayments attributable to negligence or disregard of rules and regulations and substantial understatements of income tax. Negligence is "any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return." Sec. 1.6662-3(b)(1), Income Tax Regs. A substantial understatement of income tax is defined as the greater of 10% of the tax required to be shown on a return for the year or $5,000. Sec. 6662(d)(1)(A).

Section 6662(a) accuracy-related penalties do not apply where the taxpayers establish that they acted with reasonable cause and in good faith. Sec. 6664(c)(1); <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 98 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002). We determine reasonable cause and good faith on a case-by-case basis taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's effort to assess his proper tax liability. <u>Id.</u> The taxpayer's education and business experience are also relevant. <u>Id.</u> para. (c)(1).

**[*38]** Reliance on professional advice may constitute reasonable cause and good faith if the reliance was reasonable. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd on another issue, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991); see sec. 1.6664-4(b)(1), (c)(1), Income Tax Regs. Reliance on professional advice is reasonable if (1) the professional was independent and had the expertise to justify reliance, (2) the taxpayers provided necessary and accurate information to the adviser, and (3) the taxpayers actually relied in good faith on the advice. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98-99. Taxpayers cannot rely on professional advice as a defense if they knew or should have known that the adviser had a conflict of interest; such an adviser is not independent. Id. at 98; see Paschall v. Commissioner, 137 T.C. 8, 22 (2011). An independent adviser follows his regular course of professional conduct in rendering advice, does not give unsolicited advice, and does not have a stake in the transaction besides his regular hourly rate. 106 Ltd. v. Commissioner, 136 T.C. 67, 80 (2011), aff'd, 684 F.3d 84 (D.C. Cir. 2012).

Mr. Hewitt first had the idea to protect his family's land when his father's health began to decline. Mr. Hewitt began to appreciate the land in a new way. He had lived on the land his entire life and worked on the farm with his father. He credibly testified that he wanted to protect the property so that his children could

[*39] one day have the same opportunity. An acquaintance recommended Large & Gilbert because of its experience with conservation easements. Mr. Hewitt understood that Large & Gilbert had a good reputation in the tax community and had been in business for approximately 50 years. He did not solicit or initiate a tax strategy. His motivation was to protect his family's property, not to obtain a tax benefit.

Mr. Hewitt reasonably believed that his contacts at Large & Gilbert were competent tax professionals and their advice was in compliance with tax law. He provided Large & Gilbert with the necessary and accurate information to prepare the returns to the extent the information was available. He did not know or have reason to know that the easement deduction would be disallowed.

Mr. Hewitt also reasonably and in good faith relied on Mr. Clower's qualified appraisal. He reviewed Mr. Clower's appraisal and found it consistent with his own opinion of the land's value and his opinion that the pastureland was more valuable than the wooded areas. He credibly testified that he believed the easement property was worth between $12,000 and $15,000 per acre before the easement's grant. He also credibly testified that he tried to find out how much his father had paid for the property but could not. The land had been in his family for nearly 60 years. We find that Mr. Hewitt's reliance on Mr. Clower also supports a

[*40] finding that petitioners acted with reasonable cause and in good faith in claiming the deduction. See Dunlap v. Commissioner, T.C. Memo. 2012-126, slip op. at 76 (finding that reasonable and good-faith reliance on a qualified appraiser is sufficient to establish reasonable cause).

Finally, we note that Mr. Hewitt also received conservation advice from Dr. Keller. Mr. Hewitt trusted Large & Gilbert's recommendation of the Conversancy. Dr. Keller has a doctorate in conservation biology. Mr. Hewitt credibly testified that he understood that Dr. Keller was knowledgeable and experienced in conservation issues. We find that Mr. Hewitt reasonably believed that Dr. Keller was knowledgeable and experienced in advising on the preservation of land through conservation easements. Mr. Hewitt personally met with Dr. Keller to discuss his desire to protect the family's land from development, and Dr. Keller visited the property. The Conservancy drafted the easement deed. Dr. Keller's involvement contributed to Mr. Hewitt's belief that he could rely on Large & Gilbert's advice. When Mr. Hewitt granted the easement in 2012, he did not understand Dr. Keller to be promoting a tax strategy.

We find Mr. Hewitt sincere in his testimony that he wanted to protect his family's farm land. We also note that he did not claim an excessive value for the deduction on the 2012 return. However, after 2012 Mr. Hewitt began a troubling

[*41] practice of purchasing rural, undeveloped land and selling interests in pass-through entities that he created to hold the land. Numerous entities associated with Mr. Hewitt granted conservation easements on the recently purchased land, and the investors, including Mr. Hewitt, claimed charitable contribution deductions for the easement donations far in excess of the original purchase prices for the recently purchased, underlying properties. Respondent asserts that Mr. Hewitt has realized over $3.5 million in gain from these transactions and the investors claimed millions of dollars of improper charitable contribution deductions. Petitioners claimed the carryover deductions at issue here for years during which Mr. Hewitt was engaging in this activity.

Large & Gilbert assisted in these transactions, and individuals from Large & Gilbert invested in the entities and claimed easement deductions. Respondent argues that Large & Gilbert is a promoter of conservation easement transactions. Taxpayers cannot rely on the advice of a professional who has a conflict of interest or is a promoter of the investment. Mortensen v. Commissioner, 440 F.3d 375, 387 (6th Cir. 2006), aff'g T.C. Memo. 2004-279. We find that Large & Gilbert was not a promoter and did not have a conflict of interest with respect to the easement donation on Mr. Hewitt's family farm. Mr. Hewitt did not want to donate the easement on his family farm to obtain the tax benefits. He had a

**[*42]** genuine desire to protect the land for future generations. Large & Gilbert did not promote the easement at issue.

Mr. Hewitt's activities of land purchases and conservation easements after 2012 are problematic. However, we find that under the circumstances of the easement donation of his family's farm land Mr. Hewitt reasonably and in good faith relied on Large & Gilbert's experienced advice. We have weighed Mr. Hewitt's post-2012 activities against his sincere intent to preserve his family's farm land for his father and children. The reasonable cause defense depends on the particular facts and circumstances of each case. Petitioners claimed a deduction for the easement that aligned with Mr. Hewitt's opinion of the easement property's fair market value. We disallowed the easement deduction because the deed did not satisfy technical requirements for a conservation easement deduction. We do not expect petitioners to understand these technical requirements. They made a sufficient good-faith effort to assess their tax liability and reasonably relied on professional advice when claiming the easement deduction.

We have not addressed petitioners' omission of cost basis information on Form 8283 and the attached statement as a basis to deny the easement deduction. Omission of cost basis information is a failure to strictly or substantially comply

[*43] with the regulatory reporting requirements.[10]  RERI Holdings I, LLC v. Commissioner, 149 T.C. at 16-17.  Failure to substantially comply with the reporting requirements generally precludes a charitable contribution deduction. Bond v. Commissioner, 100 T.C. 32, 41 (1993); see sec. 170(a)(1) ("A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.").  Section 170(f)(11)(A)(ii)(II) provides a reasonable cause defense for a failure to comply with the reporting requirements if "the failure to meet such requirements is due to reasonable cause and not to willful neglect."  In such a case, the deduction will not be disallowed.

We find that the omission of the basis information does not preclude a reasonable cause defense to the section 6662(a) penalties.  Mr. Hewitt explained to Large & Gilbert the reason that he could not obtain the necessary basis information, and Large & Gilbert advised him that the deduction would not be disallowed for failing to provide basis information that is not reasonably obtainable.  Mr. Hewitt provided accurate information to Large & Gilbert to prepare the Form 8283.  We find that Mr. Hewitt's efforts to determine his basis in

---

[10]Respondent argues that petitioners are not entitled to deduct the easement donation because they did not satisfy the reporting requirements of sec. 1.170A-13(c), Income Tax Regs.  We have not disallowed the easement on this basis but address the reporting requirements in our consideration of petitioners' liability for sec. 6662(a) accuracy-related penalties.

**[\*44]** the property were sufficient and the basis information was not reasonably obtainable. However, the attachment does not sufficiently restate the explanation that Mr. Hewitt provided to Large & Gilbert or at trial. It states that the basis "remains to be determined with accuracy". It also contains wording similar to that which we have previously identified as inadequate explanation, that the basis is not taken into consideration when computing the amount of the deduction and the donor had a holding period in excess of 12 months, qualifying the property as capital gains property. See Belair Woods, LLC v. Commissioner, T.C. Memo. 2018-159, at \*11-\*12. Despite the inadequacy of the explanation, we find that petitioners reasonably relied on Large & Gilbert to prepare the Form 8283 in a correct and sufficient manner to explain the omission of the basis information. Petitioners' failure to provide basis information and the inadequate explanation do not negate their reasonable cause and good faith in claiming the easement deduction. Accordingly, we find petitioners not liable for the section 6662(a) accuracy-related penalties for 2013 and 2014.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

**[*45]** To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent on the tax deficiencies and for</u>

<u>petitioners on the penalties</u>.